ADAMS ET AL. *v.* MILLS, DIRECTOR GENERAL, ET AL.

No. 581. Argued April 15, 18, 1932.—Decided May 23, 1932.

---

[11] See Note 1.

398

Mr. *Franklin J. Stransky,* with whom Mr. *Clair R. Hillyer* was on the brief, for petitioners.

Mr. *Frank H. Towner,* with whom *Messrs. Silas H. Strawn* and *Ralph M. Shaw* were on the brief, for the Union Stock Yard & Transit Co., respondent.

400

402

*Messrs. Sidney F. Andrews* and *A. A. McLaughlin* for the Director General, respondent.

404

*Messrs. Daniel W. Knowlton* and *J. Stanley Payne,* by leave of Court, filed a brief on behalf of the Interstate Commerce Commission as *amicus curiae.*

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

This action was brought, on December 10, 1928, in the federal court for northern Illinois to enforce an order of the Interstate Commerce Commission for reparations in the sum of $140,001.25, and interest. The plaintiffs, 103 in number,[1] members of the Chicago Live Stock Exchange, are commission merchants engaged in the business of buying and selling livestock at the Union Stock Yards, Chicago. The defendants are the Union Stock Yard and Transit Company, owner of the yards, and the Director General of Railroads, as agent of the President, being the officer against whom suit may be brought, under § 206 of the Transportation Act, 1920, 41 Stat. 461, on causes of action arising out of Federal control. The award was made on account of an extra charge of 25 cents a car for unloading livestock received at the yards from about 174,000 different shippers, during the period of Federal control, December 28, 1917 to February 29, 1920. The Commission held that the charge had been exacted under an unlawful practice; and awarded reparation to the plaintiffs, who as consignees had paid the charge found unlawful. See Chicago Live Stock Exchange *v.* Atchison,

---

[1] This is the figure stated in the opinions of both courts below, and in the briefs of counsel. The names of only 101 plaintiffs appear in the petition in the District Court and in the motion to amend the petition, as set out in the Transcript of Record.

406

T. & S. F. Ry. Co., 52 I. C. C. 209; 58 I. C. C. 164; 100 I. C. C. 266; 144 I. C. C. 175.

The case was tried in the District Court before a jury upon the evidence introduced before the Commission and additional evidence introduced by the parties at the trial. At the close of the evidence, each defendant moved, on many grounds, for a directed verdict. The District Judge granted the motions on the ground that the plaintiffs had no such interest in the claims for reparations as would entitle them to maintain an action under § 8 and § 16 (2) of the Interstate Commerce Act. 39 F. (2d) 80. The Circuit Court of Appeals affirmed the judgment; but, not being entirely satisfied that the reason assigned by the District Court was correct, rested its decision on the ground that the exaction of the extra 25-cent charge was a lawful practice. 51 F. (2d) 620. This Court granted a writ of certiorari. 284 U. S. 614.

*First.* The defendants contend that even if the exaction of the extra 25-cent charge·was unlawful, the plaintiffs are not entitled to recover. The argument is that under § 8 of the Interstate Commerce Act the liability of the common carrier is " to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation "; that before any party can recover under the Act he must show not merely the wrong of the carrier, but that the wrong has in fact operated to the plaintiff's injury; that here the award is to the plaintiffs individually, not as agents for the shippers; and that individually they suffered no pecuniary loss, since they paid the charges as commission merchants and reimbursed themselves for these, as for other, charges from the proceeds of the sale of livestock, remitting to their principals only the balance remaining. We think the argument unsound, for the reasons, among others, stated in *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.,* 245 U. S. 531, and *Louisville & Nashville R. Co.* v.

*Sloss-Sheffield Co.*, 269 U. S. 217, 234-238. See also Missouri Portland Cement Co. *v.* Director General, 88 I. C. C. 492, 495, 496; Doughty-McDonald Grocery Co. *v.* Atchison, T. & S. F. Ry. Co., 155 I. C. C. 47, 49; California Fruit Exchange *v.* American Railway Express Co., 155 I. C. C. 105, 107.

The plaintiffs were the consignees of the shipments and entitled to possession of them upon payment of the lawful charges. If the defendants exacted from them an unlawful charge, the exaction was a tort, for which the plaintiffs were entitled, as for other torts, to compensation from the wrongdoer. Acceptance of the shipments would have rendered them personally liable to the carriers if the merchandise had been delivered without payment of the full amount lawfully due. *New York Central R. Co.* v. *York & Whitney Co.*, 256 U. S. 406, 407, 408. Compare *Union Pac. R. Co.* v. *American Smelting & Rfg. Co.*, 202 Fed. 720, 723. As they would have been liable for an undercharge, they may recover for an overcharge. In contemplation of law the claim for damages arose at the time the extra charge was paid. See *Southern Pacific Co.* v. *Darnell-Taenzer Lumber Co.*, 245 U. S. 531, 534. Neither the fact of subsequent reimbursement by the plaintiffs from funds of the shippers, nor the disposition which may hereafter be made of the damages recovered, is of any concern to the wrongdoers. This proceeding does not involve a controversy between the consignors and the consignees; and the carriers can not be allowed to import one into it. Compare *Louisville & Nashville R. Co.* v. *Sloss-Sheffield Steel & Iron Co.*, 269 U. S. 217, 238. The rights of the shippers in the proceeds of the action will not be affected by our decision. Compare *Jennison Bros. & Co.* v. *Dixon,* 133 Minn. 268; 158 N. W. 398. Those rights might have been asserted by intervention in the proceedings before the Commission. They may still be asserted independently in appro-

priate proceedings later. The plaintiffs have suffered injury within the meaning of § 8 of the Interstate Commerce Act; and the purpose of that section would be defeated if the tortfeasors were permitted to escape reparation by a plea that the ultimate incidence of the injury was not upon those who were compelled in the first instance to pay the unlawful charge.

An additional reason for permitting this action is that the relation between the parties to the shipments in question was that of principal and factor, not simply that of consignor and consignee. The Commission found that, as commission merchants, the plaintiffs were empowered, by well-established usage, to pay the freight and related charges; to file claims for overcharges; and to settle with the carriers therefor. Being factors for the shippers, it was not only their right but their duty to resist illegal exactions. This duty did not, as the District Court suggested, terminate upon remission of the proceeds of the sale of the livestock, less the charges in fact paid. It persists, with the assent of the principals, until the claim for reparation shall have been prosecuted to a successful conclusion. It is urged, on behalf of the defendants, that the order of the Commission ran in favor of the plaintiffs, not as factors, but as individuals. The contention is contrary to the fact.[2] But the form of the order is without importance.

---

[2] The finding of the Commission in its report of June 2, 1925, was that the parties of record who " paid the charges " on the shipments involved " have been damaged in the amount of such charges and are severally entitled to reparation, as factors and agents for the shippers." 100 I. C. C. 266, 270. The fact that " the charge which was paid by the commission merchant was subsequently charged back and collected from the consignors," the report said, " would not affect the right of the complainant consignees to awards of reparation. There is a direct and well established relation between the complaining members of the exchange and their shippers by which the former are fully authorized to present these claims and seek awards of reparation in their own names as factors and agents for

The Commission has recognized the right of a factor to maintain in his own name an action in the interest of his principal. See Memphis Freight Bureau *v.* St. Louis & San Francisco R. Co., 57 I. C. C. 212; Texas Livestock Shippers Protective League *v.* Director General, 139 I. C. C. 448. No useful end would be served by requiring the joining of 174,000 shippers in this proceeding; and § 8 of the Interstate Commerce Act is not to be so construed. Compare *Spiller* v. *Atchison, T. & S. F. Ry. Co.,* 253 U. S. 117, 134, 135.

*Second.* The defendants challenge the Commission's holding that the extra charge of 25 cents made to the shippers was an unlawful practice. The conclusion rests upon the findings that the Stock Yards are, in effect, terminals of the line-haul carriers; and that the service of unloading the livestock there is a part of transportation. That the yards are, in effect, terminals of the railroads is clear. They are in fact used as terminals; and necessarily so. Whether the unloading in the yards was a part of transportation was not a pure question of law to be determined by merely reading the tariffs. Compare *Great Northern Ry. Co.* v. *Merchants Elevator Co.,* 259 U. S. 285, 294. The decision of the question was dependent upon the determination of certain facts, including the history of the Stock Yards and their relation to

such shippers. . . . The right of factors in their representative capacity to recover reparation in their own names for unlawful and unreasonable charges is settled." *Ibid.,* at 269, 270.

That the subsequent order of the Commission, of December 12, 1927, fixing the amounts due the several complainants, made no reference to their position as factors is without significance. The order expressly incorporated the report; and in the report the Commission had already determined that the complainants, as factors, were entitled to recover in their own names. Nor is the form of the petition in the District Court material. The plaintiffs' right of recovery in this proceeding was defined by the finding and order of the Commission in their favor.

the line-haul carriers; the history of the unloading charge at these yards; and the action of the parties in relation thereto. If there was evidence to sustain the Commission's findings on these matters, its conclusion that the collection of the extra charge from the shippers was an unreasonable and unlawful practice must be sustained. *Atchison, T. & S. F. Ry. Co.* v. *United States,* 232 U. S. 199, 221; *Los Angeles Switching Case,* 234 U. S. 294, 310, 311.

*Third.* There was ample evidence to sustain the findings of the Commission that the unloading of livestock at the stockyards was a part of the transportation provided for in the tariffs of the line-haul carriers.

(1) Throughout the United States, the duty of unloading carload freight rests ordinarily upon the consignee. See National Lumber Dealers' Assn. *v.* Atlantic Coast Line R. Co., 14 I. C. C. 154, 160. But continuously for fifty years prior to 1917, livestock had been unloaded at Chicago by the Stock Yards Company, without charge therefor to the shipper or consignee.[3] Compare *Covington Stock-Yards Co.* v. *Keith,* 139 U. S. 128, 136. For this service the company received 25 cents a car; but not from the shipper. Its charge was paid by the line-haul carriers, whose tariffs read: " Carriers as shown will pay the Union Stock Yards and Transit Company's charges as follows: Unloading (in cents per car) 25."

The history of the practice is this. The Union Stock Yard and Transit Company was organized in 1865 by the

---

[3] Transportation Act, 1920, § 418, 41 Stat. 486, enacted after the period here in question, provided that thereafter, with certain exceptions: " Transportation wholly by railroad of ordinary livestock in car-load lots destined to or received at public stockyards shall include all necessary service of unloading and reloading en route, delivery at public stockyards of inbound shipments into suitable pens, and receipt and loading at such yards of outbound shipments, without extra charge therefor to the shipper, consignee or owner. . . ."

railroads then entering Chicago; and until 1894 its shares were largely held by them. The company constructed stockyards and tracks connecting with those of the line-haul carriers. After 1897 the company's railroad property was operated under lease by the Chicago Junction Railway Company, which received from the line-haul carriers compensation for the use of its tracks. The line-haul carriers, using their own locomotives and crews, brought all inbound carload shipments of livestock to the unloading chutes of the Stock Yards Company; and collected from the shippers a terminal or switching charge of $2 per car, in addition to the line-haul rate.[4]

From the time when the cars were placed at the chutes, the course of business was substantially as follows: Employees of the Stock Yards Company unloaded the livestock into pens located upon the company's property and leased by it to the commission merchants who handled the stock for the shippers and who were invariably the consignees of the shipments. The Yards Company notified the commissionmen of the arrival of the shipment, prepared the official record of the receipt of the livestock, the contents of the car, and the condition of the animals— the record used by the line-haul carriers. After securing from the Western Weighing Association Bureau (a bureau of the line-haul carriers) data concerning the actual weight of the livestock, the company made a corrected record of the freight charges due from the commissionmen. These charges it collected for the line-haul carriers; and, in consideration of the prompt release of the livestock without surrender of the bill of lading and without payment of the charges, it guaranteed them. The

---

[4] The imposition of the $2 charge was the subject of much litigation before the Commission and the courts. *Interstate Commerce Comm.* v. *Chicago, B. & Q. R. Co.*, 186 U. S. 320; *Interstate Commerce Comm.* v. *Stickney*, 215 U. S. 98. Compare Chicago Live Stock Exchange *v.* Chicago Great Western Ry. Co., 10 I. C. C. 428.

practice was for the company to make collection from the consignees of all charges twice a week; and once a week to pay the whole amount thus collected to the railroads. Once a month the railroads paid the Yards Company its charges for unloading.

(2) Prior to the decision in *United States* v. *Union Stock Yard & Transit Co.*, 226 U. S. 286 (December 9, 1912), the unloading charges of the Yards Company had not been contained in any tariff filed by it with the Commission. After that decision the company filed with the Commission its Tariff No. 1, effective May 30, 1913, stating its charge to be 25 cents a car. That tariff remained in effect, without any attempt to change it, or the practice under it, until the Yards Company filed a so-called Tariff No. 2, to become effective May 21, 1917, which recited: " The charge made by this company for the service (as a carrier's agent) of . . . unloading livestock at the Union Stock Yards at Chicago, Illinois, is as follows: For unloading 50 cents (per car of any capacity)." [5]

The line-haul railroads did not join in the Yards Company's Tariff No. 2, or authorize it. They did not file new tariffs embodying the extra 25-cent charge. And they refused to absorb the extra charge. Upon such refusal, the Yards Company, in order to compel payment by the carriers, adopted the practice of withholding the sum demanded from the freight charges collected for them. In retaliation, the carriers threatened to collect those charges for themselves. The result of this controversy was an arrangement arrived at between the railroads and the Yards Company, whereby the former added the disputed charge to their freight bills, and the latter collected it from the shippers, despite their protest. These bills did not indicate that the extra charge imposed was one of the

---

[5] The tariff originally filed by the Stock Yards Company, May 30, 1913, did not contain the words in parenthesis, " as a carrier's agent."

Yards Company to the shipper.[6]  As theretofore, the whole amount collected was turned over by the company to the railroads.

Meanwhile, the Yards Company, contending that because of certain changes made in its relation with the Chicago Junction Railway it was no longer a common carrier of interstate commerce, filed with the Commission a supplement to its tariffs, to be effective September 1, 1917, in which it undertook to cancel all its tariffs. The proposed supplement was suspended by the Commission under § 15 (7) of the Interstate Commerce Act; and, before any decision had been reached in the suspension proceedings, the Chicago Live Stock Exchange filed its complaint against the Yards Company and the line-haul railroads challenging the extra 25-cent charge. The proceedings were consolidated. Soon thereafter, the railroads passed under Federal control; and the Director General, who continued the arrangement instituted by the carriers with the Yards Company, became a party to the proceedings before the Commission. That arrangement continued to the end of the period of Federal control, as the order of the Commission declaring the practice unlawful was not entered until July 15, 1920, 58 I. C. C. 164.

(3) Thus, by the unbroken usage of fifty years the payment by shippers of livestock of the line-haul rate to Chicago, plus the terminal charge of $2, had covered all services performed in connection with the shipment up to

---

[6] The freight bills were made out upon forms, headed " United States Railroad Administration—Director General of Railroads," together with the name of the carrier; and, so far as appears, showed only the total charges, entered in a column marked " Freight Charges." The way-bills, however, contained itemized charges, as follows: " Total charges on Original Way-bill; " " Feed Charges at . . ."; " Yardage at . . ."; and " Inspection at. . . . ." In the last column was entered the terminal charge of $2; in the column for " yardage " was the entry, " Unabsorbed Unloading—25c."

and including the placing of the stock in the pens of the commissionmen. The Commission so found; and this Court has heretofore so recognized. See *Interstate Commerce Comm.* v. *Chicago, B. & Q. R. Co.*, 186 U. S. 320, 327, 329, 336; *Interstate Commerce Comm.* v. *Stickney*, 215 U. S. 98, 108. Beyond dispute, the Yards Company, in the services which it performed, regarded itself as the carriers' agent. This appears not only from the previous course of business, but from the terms of its second tariff, from its initial conduct with respect to collection of the additional charge and from its attempt to cancel all its tariffs. The carriers for years had paid the Yards Company all its charges; and there was testimony that both the $2 terminal charge and the line-haul rates were predicated upon such payment. The company's charges, moreover, which constituted its sole compensation, covered services, other than the mere unloading of cars,—services which were obviously performed for the benefit of the carriers rather than the shippers.

Whether, upon the company's demand for increased compensation, the carriers, under their tariffs, could lawfully join with it in shifting the burden of such increase to the shippers depended upon the question of fact whether the unloading of cars was the proper duty of the railroads or of the consignees. The basis of the usual practice requiring the consignee to unload carload freight is that the consignee can do it more effectively than the carrier. See National Lumber Dealers' Assn. *v.* Atlantic Coast Line R. Co., 14 I. C. C. 154, 160. The Commission found that, in view of the congested conditions in the Chicago stockyards and the great volume of traffic, it would have been physically impracticable, if not impossible, for the consignees themselves to unload their own shipments. Certainly the Commission could reasonably determine upon this evidence that the conditions with respect to livestock in Chicago justified a different rule there from that

obtaining in other places; that, in fact, a different practice had prevailed; and that no reason existed for permitting a departure from that practice.

*Fourth.* It is urged by the defendants that the Stock Yards Company had been found by this Court to be a common carrier, *United States* v. *Union Stock Yard & Transit Co.,* 226 U. S. 286; that this finding was adhered to by the Commission in the present proceeding despite the claim of a change in conditions; that as a common carrier the company was compelled to publish its tariffs; that the tariff, as published, has not been found by the Commission to be unreasonable; and that its collection, therefore, was mandatory and hence could not be unlawful. But the tariff, as published, authorized only the collection of the charge as a carrier's agent. The question at issue is not the reasonableness of the charge, but the lawfulness of the practice, jointly pursued by the railroads and the company, of collecting the extra charge from the shipper. The reasonableness of the charge itself, and the complementary question whether the railroads should be required to absorb it, were in no way involved before the Commission; and that tribunal properly made no finding with respect thereto. Nor was the issue affected in any manner by the status of the Yards Company as a common carrier. It did not follow from such status that it could not act as an agent of the line-haul carriers, nor that it was entitled to collect a part of its charges from the shippers. Compare *Missouri Pacific R. Co.* v. *Reynolds-Davis Grocery Co.,* 268 U. S. 366; *Union Stockyards Co.* v. *United States,* 169 Fed. 404, 406.

*Fifth.* Certain additional grounds of defense, not considered by either of the courts below, are pressed here. The Director General urges that the terms of Congressional consent do not permit him to be proceeded against before the Commission for a tort, compare *Missouri Pa-*

*cific R. Co.* v. *Ault,* 256 U. S. 554, 559, but only for damage resulting from the " collection or enforcement by or through the President during the period of Federal control of rates, fares, charges, classifications, regulations or practices . . . which were unjust, unreasonable, unjustly discriminatory, or unduly or unreasonably prejudicial." Transportation Act, 1920, 41 Stat. 462, c. 91, § 206 (c). The contention that the acts of the Director General, found by the Commission, did not in any view constitute an " unjust or unreasonable practice " within the meaning of this provision, is manifestly untenable. The contention is really directed against the Commission's finding that the Director General participated in the practice. Ample support for this finding is furnished by the conceded fact that the extra charge was added by the railroads to their freight bills, and by the testimony that these bills were first collected by the Yards Company, that the entire proceeds were paid over to the railroads, and that the railroads subsequently compensated the company.

*Sixth.* The Stock Yards Company urges several independent grounds of defense, not joined in by the Director General. It is argued that the order sued on includes awards of reparation against the company on purely intrastate shipments moving during the period of Federal control; that the jurisdiction conferred on the Commission by Transportation Act, 1920, 41 Stat. 462, c. 91, § 206 (c), to grant reparation on claims arising out of intrastate traffic during Federal control does not permit the inclusion of such elements in an award against the Yards Company, which was never taken over by the Government; and that, the petitioners not having established by proper proof to what extent the award made was valid, the order must be declared invalid as a whole. The record, however, does not show that this objection was

urged either before the Commission or in the District Court; and it accordingly will not be entertained here.

The remaining contentions of the Yards Company relate to the sufficiency of the complaint in Docket No. 9977, to the competency of the evidence upon which the amount of the reparation awarded to each complainant was determined; and to a claim that the Commission acted upon evidence not in the record. We have considered these objections; and find them to be without merit.

The judgment of the Circuit Court of Appeals is reversed; and the case is remanded to the District Court with direction to enter judgment for the amount of reparation awarded, with interest, and for reasonable attorney's fees to be fixed by it.

*Reversed.*

MR. JUSTICE BUTLER is of the opinion that plaintiffs are not " persons injured " within the intention of § 8 and that the assailed " practice," if it is such within the meaning of the Act, was not unreasonable and that therefore the judgment should be affirmed.