**ARMOUR & CO. v. ALTON R. CO. et al.**
**No. 16171.**

District Court, N. D. Illinois, E. D.
May 31, 1939.

Chas. J. Faulkner, Jr., Paul E. Blanchard, and Walter C. Kirk, all of Chicago, Ill., for plaintiff.

Hay, Morton & Freytag, Sidley, McPherson, Austin & Burgess, Winston, Strawn & Shaw, and Bryce L. Hamilton, all of Chicago, Ill., for defendants.

HOLLY, District Judge.

Armour and Company, an Illinois corporation, engaged in the purchase and slaughter of livestock, filed its complaint in the Circuit Court of Cook County against the Alton Railroad Company and various other railroad companies and trustees of railroad companies praying that the court decree that it is "entitled to delivery of livestock consigned to it at the Union Stock Yards, Chicago, Illinois, at the unloading pens at the Union Stock Yards at Chicago, Illinois, or at such other point as the same may be tendered, upon plaintiff paying, or making lawful arrangement to pay, the tariff rates and charges of defendants applicable to such shipments without the imposition of any charge or charges in addition thereto, and free from any lien or claim of the Stock Yards Company or of any other person, firm or corporation"; "that a mandatory injunction be entered requiring the defendants, and each of them, under penalty of the law, on and after a date to be fixed by this court, to provide suitable ingress for Plaintiff to a point at which such livestock is tendered and proper and reasonable egress for removal of its livestock from the unloading pens of the Defendants, or from such other point in said station where delivery may be tendered to plaintiff at the Union Stock Yards in Chicago, Illinois, without the payment of any charge or charges therefor by the Plaintiff to the Stock Yards Company, or any other person, firm or corporation, save and except the said rate for transportation for said livestock, lawfully applicable there-

626

to," and for an accounting as to monies therefor paid by plaintiff to the Union Stock Yards Company for yardage and other charges.

Each of the defendants has filed a motion to dismiss. The corporate defendants set up as ground therefor that the questions raised by the complaint are questions over which the Interstate Commerce Commission and the Illinois Commerce Commission have primary jurisdiction, and until those questions have been decided by the Commission in favor of the plaintiff neither the State nor Federal Court may entertain the suit, and further, that there is a defect and non-joinder of a party indispensible to the suit in that the Union Stock Yards and Transit Company of Chicago has not been joined as a party. Further, the trustee defendants have moved to dismiss on the ground that the corporations which they represent are in the process of reorganization under Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205; that leave has not been granted to plaintiff in those proceedings to bring this action and that the action may not be maintained without such leave having first been granted.

The facts as set forth in the complaint are as follows:

Plaintiff is engaged in the purchase and slaughter of livestock and the processing and sale of meats derived therefrom, operating a plant for such purpose in the City of Chicago, Illinois, adjacent to the properties of the Union Stock Yards and Transit Company (hereinafter referred to as the Stock Yards Company). Plaintiff purchases and ships to itself from points in Illinois and other States livestock which is shipped over the railroad lines of defendants consigned to a station of the defendants at the Union Stock Yards at Chicago. This is a joint station used by all of the defendants. It is not on land owned by defendants or any of them but is located on the private property of the Stock Yards Company. This station had been so used as such common depot or station for the receiving, loading, unloading and delivery of ordinary livestock and included loading and unloading platforms, chutes, chute pens, alleys and storage pens and other facilities necessary to the shipment, receipt for shipment or delivery of livestock transported by rail, all of which facilities are and for many years have been located adjacent to the rails used by each of the defendants' trains in reaching said Union Stock Yards and

into which facilities inbound shipments of livestock are unloaded, and from which facilities delivery of such livestock consigned to said station is tendered to consignees after such unloading. The said unloading platforms, chutes, chute pens, alleys and storage pens at said station have been for many years and are now owned and operated by said Stock Yards Company. The Union Stock Yards Company is and has been since December 30, 1931, a public stockyard posted as such by the Secretary of Agriculture pursuant to the provisions of Section 302 of the Packers and Stockyards Act, 1921, U.S.C.A. Title 7, Chapter 9, Section 202, and the defendants have for many years had, and still have, an arrangement with the Stock Yard Company whereby said company would act and has acted and still acts as their agent in receiving cars, unloading from cars and holding livestock in its pens at the Union Stock Yards until delivery thereof could be tendered to or taken from said Stock Yards by the consignee.

For many years each of said defendants have transported livestock in car loads to said station with their own respective engines and crews to the railroad track immediately adjacent to the unloading platforms of the Stock Yard Company and have there delivered possession of such shipments on the track in cars to said Stock Yard Company and engaged the Stock Yard Company as their agent to unload such livestock from said cars and to otherwise complete each transportation contract of the respective defendants with respect to livestock consigned to the Union Stock Yards and has paid the Stock Yards Company for such unloading and placing the livestock in pens.

Prior to May 25, 1933, plaintiff for many years has made shipments of livestock to itself at the Union Stock Yards Company which the Stock Yards Company was authorized to accept and hold for plaintiff or store or drive to plaintiff's packing plant as plaintiff's agent after the transportation thereof by unloading and placing in the pens had been completed.

But on May 9, 1933, plaintiff notified each of the defendants and the Stock Yards Company in writing that on and after May 25, 1933, it would accept delivery on all shipments of livestock consigned to it either at the unloading chutes or at such other point at which delivery of livestock was tendered by defendants and would remove the livestock from the point of de-

livery within a reasonable time after such delivery; and that on and after said date it would not pay the defendants or to the Stock Yards Company any charges on livestock accepted and removed by it save and except the charges lawfully applicable for the transportation thereof; that on May 10, 1933, the Stock Yards Company notified plaintiff in writing that it had received said notice but that it would demand the payment of certain yardage charges alleged to be due it on all livestock at said station and placed in possession of said Stock Yards Company by any or all defendants; that no one of the defendants owned or maintained any pens or other facilities at said station through which livestock unloaded by said Stock Yards Company could be delivered to plaintiff without payment of the charge over and above the rates and charges named in defendants' tariffs for transportation, and that on and after May 25, 1933, said Stock Yards Company would refuse to deliver to plaintiff livestock of plaintiff coming into the possession of it, the Stock Yards Company, as carriers' agent for unloading, unless and until plaintiff paid or promised to pay to the Stock Yards Company the charges demanded by said Stock Yards Company over and above all charges for transportation by defendants.

Thereafter on May 16, 1933, plaintiff notified each of the defendants of the demands of said Stock Yards Company, and that on and after May 25, 1933, the Stock Yards Company would not have authority, after unloading such livestock, to accept or receipt therefor in plaintiff's name or for its account; that any delivery of plaintiff's livestock by any defendant to the Stock Yards Company (other than delivery as defendants' unloading and delivery agent) would constitute a conversion of plaintiff's property and that any payment made by plaintiff in order to gain possession of its property from said Stock Yards Company would be made under protest for account of defendant who had placed the livestock in possession of the Stock Yards Company, and in mitigation of damages. At the same time plaintiff notified the Stock Yards Company that on and after May 25, 1933, it would accept delivery of such livestock at the unloading chutes or any other point where tender thereof was made and promptly remove the same from the premises of the Stock Yards Company and that on and after said date plaintiff did not desire and would not accept, receive or pay for any

service rendered to, or facilities used by said Stock Yards beyond the point at which it was ready and willing to accept said livestock when and where tendered, and from which it was ready and willing to promptly remove such livestock from the point of delivery.

Each defendant well knew that it could not fully perform its contracts for the transportation of shipments of livestock to said Union Stock Yards, and for delivery thereof to the plaintiff at such station, save by use of the pens, platforms, chutes and other facilities of said Stock Yards Company and well knew before it delivered possession of said livestock to said Stock Yards Company for unloading from cars that said Stock Yards' Company would unload, hold and tender delivery of the same at a point which was accessible to plaintiff only by crossing other property of said Stock Yards Company and from which, after tender and acceptance of possession, no egress could be had by plaintiff with its livestock, except by crossing the property of said Stock Yards Company, and well knew that said Stock Yards Company would refuse to complete said transportation contract or surrender possession of said livestock to plaintiff unless and until the plaintiff had paid or promised to pay a toll or charge for crossing the premises of said Stock Yards Company and for driving its animals across said premises after delivery, notwithstanding which defendants, on May 25, 1933, refused, and have since said date continuously refused, to provide or establish at their common station, Union Stock Yards, Chicago, Illinois, any depot or platform, pens, and facilities over and through which plaintiff might accept delivery of, and from which plaintiff might remove its said shipments, without payment of any toll or charge other than the charges lawfully applicable to the transportation of such livestock, and that the defendants wholly failed to make any arrangement with the Stock Yards Company by virtue of which plaintiff might have free ingress to the point at which the delivery of livestock was tendered and egress from the point of delivery thereof to a public street or other point off the premises of said Stock Yards Company without being compelled to pay a toll or charge over and above the lawful charges for transportation.

Since May 25, 1933, plaintiff has been compelled, in order to obtain delivery of livestock consigned to it and arriving at the Union Stock Yards Company over the lines

of defendants to pay a charge made by the Stock Yards Company for keeping such livestock and for ingress to and egress from the yards of said Stock Yards Company. The lines of the defendants, so it is stated in the complaint, constitute all the carriers by rail traversing the livestock production areas within which plaintiff purchases and ships or caused to be shipped livestock to its order at the Union Stock Yards, Chicago, Illinois. Plaintiff at no time has demanded from any defendant or the Stock Yards Company the right to use any specific pens, alleys, runways, overhead drives or tunnels of the Stock Yards Company in accepting delivery or removing livestock from the point at which delivery was tendered to the packing plants of plaintiff but sought only to be permitted to take possession of its shipments of livestock at the unloading point used by the defendants as their depot or station in said Union Stock Yards, or at whatever point therein tendered, and thence remove said shipments of livestock to a public street or to such other point off the premises of said Stock Yards Company as that company or the defendants might designate and by whatever route or means of egress might from time to time be determined by the defendants or the Stock Yards Company.

■ The gist of the controversy appears to be this: Plaintiff buys at various points in the country and ships to itself over the railroads of defendants livestock destined to the joint station of defendants at the Union Stock Yards, Chicago. Defendants have the duty, under the law, of unloading the livestock in pens ready for delivery to the consignee. Covington Stock-Yards Co. v. Keith, 39 U.S. 128, 11 S.Ct. 461, 35 L. Ed. 73. Defendants' station is not located on the property of the defendants or any of them, but on the private property of the Union Stock Yards Company. The defendants employ the Union Stock Yards Company to perform for them the duty of unloading the livestock and putting it in pens, these pens being the property of the Stock Yards Company situated on the private property of that company. Prior to May 25, 1933, the Stock Yards Company stored in their pens the livestock consigned to plaintiff. The livestock was delivered to plaintiff by the Stock Yards Company when called for by plaintiff who paid the Stock Yards Company a charge referred to in the briefs as "Yardage". About ten days prior to the 25th of May, 1933, plaintiff notified the defendants and the Stock Yards

Company that it did not desire the services of that company (other than the service of unloading and placing in pens the cost of which was included by defendants in the costs of transportation) and demanded that the defendants deliver the livestock to it and permit it to remove it from the Stock Yards without the payment of any charge in addition to the regular charge for transportation. The defendants refused to take any action other than to deliver the livestock in the pens in the Stock Yards, although they knew, as plaintiff alleges, that the Stock Yards Company would not permit plaintiff to remove its livestock without the payment of the charge for yardage. The Union Stock Yards Company replied simply that it would refuse to deliver the livestock to plaintiff unless and until plaintiff paid the yardage charge. Since May 25, 1933, plaintiff has paid the yardage under protest and under this complaint seeks to recover of the defendants the amounts it has been compelled to pay to the Stock Yards Company to obtain possession of its livestock. It also prays for a mandatory injunction as set out above. The matters for the court to determine are whether the questions presented are primarily for the Illinois and Interstate Commerce Commissions rather than for the court, and whether the Stock Yards Company is a necessary party. There is also the question whether this suit may be maintained against the trustees without first obtaining leave of the court or courts which appointed them.

■ First. If this were a suit to recover merely a charge for transportation in excess of the tariff rates approved by the Interstate Commerce Commission, plaintiff could maintain its action. Great Northern Ry. Co. et al. v. Merchants' Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 479, 66 L.Ed. 943. But in that case the court said:

"Whenever a rate, rule, or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission. Sometimes this is required because the function of being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the inquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an un-

reasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases. It is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts. But what construction shall be given to a railroad tariff presents ordinarily a question of law which does not differ in character from those presented when the construction of any other document is in dispute."

This case seems to me to come squarely within the rule there laid down. Here the defendants have made no charge in excess of the established rates. They have received no money other than that to which they were entitled for the carriage of the livestock. The stock was carried to the station designated by the shipper. It was unloaded and placed in pens in the manner that had been customary for many years prior to May 25, 1933, and to which plaintiff assented prior to the giving of the notice mentioned in the complaint. Plaintiff has long known that the Union Stock Yards station of defendants was on the property of the Union Stock Yards and Transit Company. It knew that the livestock when taken from the cars was put in pens located on the property of and owned by the Stock Yards Company. It now demands that the livestock be delivered directly to it and that it be given the right of ingress to and egress from the property of the Stock Yards Company without being required to make payment to that company. Its demand may be proper and reasonable, but that is a question of administration for the Interstate Commerce Commission and Illinois Commerce Commission. It may well be that if a railroad establishes its station upon private property it is bound to make such arrangements with the owners of the property that consignees of freight may, without payment of fee to the owner of the ground, have access to the station for the removal of the freight. Ordinarily, such service would be required.

But here we have a situation where for many years plaintiff and other shippers have consigned and are now consigning their stock to the Union Stock Yards station knowing that after the unloading of the stock and placing it in pens it could not be removed to their processing establishments without the use of the facilities owned by the Stock Yards Company. Whether there are other stations in Chicago of the defendants provided with facilities for the delivery of livestock and which plaintiff might use does not appear of record. It is possible that the solution of the problem is to require the railroads to provide proper stations on their own property or adjacent to plaintiff's plant. Covington Stock-Yards Co. v. Keith, supra. All these are questions for the Commerce Commissions of the State and Federal governments. [1]

■ Plaintiff urges the court to take jurisdiction to this case because under the doctrines of Procter & Gamble Co. v. United States, 225 U.S. 282, 32 S.Ct. 761, 56 L. Ed. 1091, if it were to go to the Interstate Commerce Commission and be denied relief, no matter how erroneous the ruling of the Commission, plaintiff would have no right to appeal. Whatever fears the plaintiff may have had on this score would seem to have been set at rest, in my opinion, by the Supreme Court in Rochester Telephone Corporation v. United States et al., 59 S.Ct. 754, 83 L.Ed. ——, decided April 17, 1939, not yet officially reported.

This is a case for the Commerce Commissions and not for the court, and for that reason the complaint should be dismissed.

■ Second. Is the Union Stock Yards and Transit Company an indispensable party to this litigation? In my opinion it is. Plaintiff prays for a mandatory injunction compelling defendants to provide plaintiff suitable ingress to the yards of the Stock Yards Company, and egress from the yards with its livestock without payment of any charge. How the court, not having jurisdiction of the Stock Yards Company, could enforce such an order plaintiff does not explain. Because of the non-joinder of the

---

[1] Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Texas & Pac. Ry. Co. v. American Tie Co., 234 U.S. 138, 34 S.Ct. 885, 58 L. Ed. 1255; Loomis v. Lehigh Valley R. Co., 240 U.S. 43, 36 S.Ct. 228, 60 L. Ed. 517; Midland Valley R. R. Co. v. Barkley, 276 U.S. 482, 48 S.Ct. 342, 72 L.Ed. 664; Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184.

Stock Yards Company the complaint should be dismissed.

■ Third. The trustee defendants, trustees of the various railroad corporations, appointed under the provisions of Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, assert that plaintiff cannot maintain an action of this nature against them without leave of the courts that appointed them. Plaintiff relies on Section 66 of the Judicial Code, Title 28, Sec. 125, U.S.C.A. I am of the opinion that the section relied upon does not authorize the maintenance of such an action as this. Barton v. Barbour, 104 U.S. 126, 26 L.Ed. 672; Ex Parte Baldwin, 291 U.S. 610, 54 S.Ct. 551, 78 L.Ed. 1020, Merryweather v. United States, 9 Cir., 12 F.2d 407.

The motions of the defendants to dismiss the complaint will be sustained. An order will be entered accordingly.