**TWIN PORTS OIL CO. v. PURE OIL CO.**
**No. 11902.**

Circuit Court of Appeals, Eighth Circuit.
May 20, 1941.

See, also, D.C., 26 F.Supp. 366.

Ernest A. Michel, of Minneapolis, Minn. (Tom Davis, Carl L. Yaeger, and John P. Devaney, all of Minneapolis, Minn., George H. Lommen, of Eveleth, Minn., Fred Ossanna, of Minneapolis, Minn., and Walsh & Walsh, of St. Paul, Minn., on the brief), for appellant.

David T. Searls, of Chicago, Ill. (S. A. Mitchell, of Chicago, Ill., R. D. Shewmaker, of St. Louis, Mo., L. E. Isaksen, of Madison, Wis., R. L. Wagner, of Chicago, Ill., Harry S. Stearns, of St. Paul, Minn., Vinson, Elkins, Weems & Francis, of Houston, Tex., Thompson, Mitchell, Thompson & Young, of St. Louis, Mo., Thomas, Orr & Isaksen, of Madison, Wis., and Stearns & Stearns, of St. Paul, Minn., on the brief), for appellee.

Before WOODROUGH, JOHNSEN, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This is an action to recover treble damages by the plaintiff, appellant here, an oil jobber in Duluth, Minnesota, for losses alleged to have been sustained by it due to violation, by appellee and other major oil companies, of the Sherman Anti-Trust Law. Act July 2, 1890, 26 Stat. 209, 15 U.S.C.A. §§ 1–7, 15 note. The case is based upon the government prosecution and conviction of various oil companies, including appellee, upon the charge of a price fixing conspiracy consisting of a concerted buying program for the purchase of gasoline from independent refiners in the East Texas and Mid-Continent fields, for the purpose of increasing the tank-car spot price. United States v. Socony-Vacuum Oil Company, Inc., et al., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. It is alleged in the indictment that this, in turn, had the effect of increasing the retail price of gasoline in the Mid-Western Area.

In its complaint appellant alleged that for some months prior to April 1, 1933, it was a jobber engaged in the selling of gasoline, oils, and allied products in the City of Duluth, Minnesota, and vicinity; and had for more than ten years, as such jobber, dealt in its business with appellee; that by reason of the confidence engendered by such relationship, it had taken steps to increase and expand its business and holdings; and on said first day of April, 1933, had entered into a contract and agreement with appellee whereby appellant was allotted certain fixed territory as to the distribution and sale of certain products, gasoline, etc., which it agreed to purchase from the Pure Oil Company. That under the terms of said contract the margin which the appellant was to receive for the handling and sale of gasoline for said Pure Oil Company was approximately 6.83 cents per gallon, based upon the agreements and stipulations in said contract contained.

In its first amended complaint appellant defined this margin as follows:

"That as used in this complaint, and in all Exhibits annexed hereto, the term 'margin' did and does mean the difference between the retail price of gasoline fixed by the defendants and the tank car price fixed by the defendants for gasoline, free on board railway tank cars at Tulsa, Oklahoma, plus all rail freight from Tulsa, Oklahoma, regardless of point of origin, to destination, plus State and Federal gasoline taxes."

In its brief counsel for appellant concede that the word "margin" was thus defined in its original complaint, but state that it was not defined in its amended amended complaint, and insist that the case was not tried on the "margin theory". Instead, it urges that the case was tried upon the "illegal exacting theory" stated in paragraph 16 of the amended amended complaint, wherein it was alleged that the defendant: "did artificially raise and fix said tank car prices of gasoline in said spot market and did artificially raise and fix said spot market tank car prices of gasoline and did and have at all times herein mentioned maintained said prices at artificially high and non-competitive levels and at levels agreed upon among defendants and that defendants did intentionally increase and fix the tank car prices of gasoline contracted to be sold and which were sold in interstate commerce to plaintiff and other jobbers in said Mid-Western Area."

It is to be observed that nothing in this last quotation, nor claimed in the amended amended complaint, withdraws or contradicts the definition of "margin" contained in the original complaint, nor is any effect of the conspiracy stated further than the artificial raising of tank car prices of gasoline in the spot market, which mean the prices of gasolines free on board railway tank cars,—that is, the prices which appellant and those similarly situated would have to pay. Nothing in this quotation contains reference to any necessary effect upon the selling price by appellant, nor upon its margin as a jobber.

To determine the theory upon which the case was tried we have recourse to the testimony and evidence contained in the record. In the stipulation, made August 22, 1940, to limit the issues to be heard when the case should come on regularly for trial, the definition of "margins" was again expressly stated thus:

"The term 'margins', as used in this stipulation, means the difference between the retail price of gasoline, less taxes, inspection fee and commission paid to reseller and the basic tank car price paid by plaintiff plus freight."

October 8, 1940, plaintiff sought further to amend its complaint after the stipulation previously had been signed and after that stipulation had been presented to the court at a pre-trial hearing. The following colloquy took place between court and counsel:

"Mr. Searls (for defendant): Isn't it true that you claim your injury relates to margins in this case?

"Mr. Michel (for plaintiff): Yes, it relates to margins.

"Mr. Searls: And you have defined 'margin' in the stipulation?

"Mr. Michel: Yes.

"Mr. Searls: And that is a definition that you put into the stipulation?

"Mr. Michel: Yes, and the margin would have been different but for the conspiracy.

"Mr. Searls: In other words you claim your injury relates to margin as defined in the stipulation?

"Mr. Michel: Yes. We want to show— we want this broad enough—that if it had not been for the conspiracy our margin would have been greater, and we think under the very liberal interpretation of the new rules, we should be permitted to do this.

"The Court: Well, how are you going to be prejudiced by the amendment as offered, Mr. Searls?

"Mr. Searls: If the Court please, I do not raise any question about notice. I was given notice two weeks ago. The only question I raise is that it does not seem to me it is proper for the plaintiff to amend his complaint after signing this stipulation.

"The Court: Of course I think, Mr. Michel, that according to the stipulation, you have indicated that your damages are solely to be found in the lessening of your margins, and the consequent injury upon your business.

"Mr. Michel: Yes, and we want to show how they were lessened.

"The Court: Then you do not depart from that theory of damages? In other words, that the immediate result of this conspiracy was a lessening of your margins?

"Mr. Michel: Yes, that is our theory.

"The Court: But you contend that even though there was a reflected increase in the retailers' price, that the stabilization of

price and the fixing of price in some way affected your margins—is that right?

"Mr. Michel: Yes, that is our point.

"The Court: And you are following along the same theory with reference to damage, in that it refers exclusively to the lessening of margins?

"Mr. Michel: Yes.

"The Court: Well, if that is his position, I think I will allow the amendment."

It is conceded that the price of gasoline at the service stations, such as those operated by appellant, was determined and fixed by the Standard Oil Company. Neither party to this action had any voice in this determination. The margin of the jobber was the difference between this retail price, less taxes, inspection fee and commission, and the basic tank car price paid by appellant, plus freight.

Following in the record is the deposition testimony of Mr. Axel E. Friedman, one of the organizers and one of the principal stockholders of the appellant corporation:

"In the contract that the Twin Ports Oil Company had with The Pure Oil Company there is a price provision which has a guaranteed margin. It is a protection to the purchaser. It is a guarantee of a certain gross profit regardless of what happens to the price. It was given by The Pure Oil Company to Twin Ports Oil Company and guaranteed that Twin Ports Oil Company would have a margin of profit of 5¢ below the service station price as fixed by the Standard Oil Company of Indiana at Duluth. Pure guaranteed that they would so bill us that we would always have at least a margin of profit of 5¢ per gallon. This was written in the contract. I do not know of any time when Pure failed to give us 5¢ margin. The Pure Oil Company increased the amount of that guaranteed margin. I do not know that there is any provision in the contract for giving us a greater margin than 5¢.

"Q. Now, after this contract was executed you allowed your dealers a larger margin, didn't you? A. When the larger margin was put in effect, yes.

"Q. When you did that then the Pure Oil Company increased the amount of their guaranteed margin to you to five and a half cents? A. They did.

"Q. That was a half a cent more than the five cents provided for in the contract? A. Yes.

"Q. Now, let us see what that means. You have stated that the Standard Oil Company determined your service station price. A. They did.

"Q. If you had a guaranteed margin below the price posted by the Standard Oil Company, that gave you the assurance of getting that amount of profit, didn't it? A. That is true.

"Q. The contract went on to provide, 'If the price of Purol-Pep Gasoline determined as above should give Seller a refinery netback price at its Oklahoma refineries of less than one and three-fourths cents per gallon, such margin of five cents per gallon shall be reduced'? A. That is true.

"Q. Don't you know that there was a time in 1933 when the Pure Oil Company was getting less than 1¾ cents a gallon for its gasoline? A. For a short period.

"Q. And it didn't take advantage of this clause and reduce your margin, did it? A. No.

"Q. It kept on giving you that five cents? A. Yes.

"Q. Notwithstanding the fact it had the right to reduce that margin under the terms of the contract? A. That is true."

In the testimony of the witness John J. Cox, originally an engineer, but later the owner of oil plants in several Michigan cities, the following is found:

"Q. Now, based upon this vast experience that you have detailed here, I will ask you if as an oil man you have an opinion as to the effect of the buying programs upon the tank car prices f. o. b. Group III, during 1935, from March, until April, 1936? Have you such an opinion? A. Yes.

"Mr. Searls: That is the spot market price?

"Mr. Michel: Yes.

"Q. What is that opinion? A. Well, my opinion is that the buying program put a floor under the market, the tank car market of 2¼ cents per gallon.

"Q. During that period of 1935 to 1936? A. Yes, sir."

Later Cox was recalled by counsel for appellant to explain what he meant by this testimony:

"Q. Mr. Cox, this morning you used the term—which may be perfectly understandable to you in the oil business, but I don't know that it is to the Court and jury definitely—in answer to my question as to the effect of the buying program in 1935 and

1936 upon the tank car price at Group III, you said it had the effect of placing a floor of 2¼ cents on it. Tell the jury what you mean by the word 'floor'. A. I mean that it would have been—the price would have been—the tank car market price would have been 2¼ cents under what it was."

At the close of plaintiff's testimony defendant filed motion for a directed verdict on the grounds that:

"There is no evidence that the plaintiff suffered or sustained any damage as a result of the increase in the tank car spot market price claimed by the plaintiff.

"There is no evidence that the plaintiff suffered or sustained any damage as a result of the conspiracy alleged by the plaintiff.

"The plaintiff has failed to prove any causal connection between the conspiracy alleged by it and any of the damages claimed by it."

In the argument that followed Mr. Michel, counsel for plaintiff, voiced his objections to the motion in the following language:

"The plaintiff contends, maintains and claims, that under the undisputed testimony of the witness, John Cox, a provable damage to the plaintiff of 2¼ cents per gallon for all gasoline purchased by the plaintiff, appears in this case.

"And the record should show, I presume, that the plaintiff objects to the granting of the motion to direct a verdict on the ground that it is a deprivation of rights of the plaintiff to a trial by jury, and on the ground that a provable damage has been shown under the undisputed testimony of John Cox."

The Court sustained this motion and in so doing gave the following among other reasons for so doing:

"The trouble with plaintiff's case is, in so far as the damages are concerned, that it has failed to prove that it sustained lessened margins by reason of any increase in gasoline prices; and repeating what I said before, starting out with March 22nd, I think it was, in 1935, when this so-called conspiracy became effective, the retail prices had already gone up, and the first billing that plaintiff received on tank car gasoline reflected that same increase that was evident in the retail price, and that continued all along until 1935 and 1936. The price to the Twin Ports Oil Company for gasoline was never increased except that it reflected a corresponding increase in the retailers' price, so the margins were not lessened, and plaintiff's own testimony shows that; and the basis of the action is for recovery of damages as I say, for lessened margins, and in the absence of lessened margins, there can be no recoverable damages in this case.

The same reasoning applies to the so-called good will. In other words, any loss in the sale of this property, in so far as good will is concerned, cannot be attributed to the defendant in the absence of proving that there was actual damage caused by this so-called buying program."

■ We find that the record fully supports the statements of the trial court and its action in sustaining defendant's motion for a directed verdict. It is evident from the argument of appellant's counsel in their brief that they found it impossible to show that an increase in the price of gasoline to appellant was not immediately reflected in a corresponding increase in the retailers' price during the years in question. Therefore, there was no loss in margins, nor in the sale of appellant's property that could be attributed to this so-called buying program. There was Cox's testimony, however, that, as a result of this buying program, the tank car prices of gasoline had been raised by a little over two cents per gallon. Of course this could in any event result in no damage to appellant, absent proof that its selling price was not correspondingly increased, and particularly since its contract with appellee protected the stability of its margins. Therefore, appellant was constrained to base its claim to recover upon rules announced in cases involving fundamentally differing enactments and distinctive grounds for relief. In this connection its counsel cite specifically Southern Pacific Company et al. v. Darnell-Taenzer Lumber Company, et al., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451, and Adams v. Mills, 286 U.S. 397, 52 S.Ct. 589, 76 L.Ed. 1184. The first of these cases involved an order by the Interstate Commerce Commission of reparation for unreasonable freight charges; and the carrier was directed to pay such charges to the one who had paid the unreasonable excess, as the proximate loser, without following each transaction to its ultimate result. In this case it will be observed that the illegal unreasonable excess is definitely and specifically found by the Commission in its order, and its repayment to the one who has suffered the loss by such overpayment is fixed. The Supreme Court,

however, took occasion to distinguish another reparation case (Pennsylvania R. Co. v. International Coal Mining Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas. 1915A, 315), where a party that has paid only the reasonable rate "sues upon a discrimination because some other has paid less". Mr. Justice Holmes said: "There the damage depends upon remoter considerations. But here the plaintiffs have paid cash out of pocket that should not have been required of them, and *there is no question as to the amount of the proximate loss.*" 245 U.S. loc. cit. 534, 535, 38 S.Ct. loc. cit. 186, 62 L.Ed. 451. (italics supplied.)

In Adams v. Mills, supra, Commission merchants to whom, as factors, shipments had been consigned for sale, and who were obliged to pay unlawful unloading charges to carriers, were held to be proper parties to claim and sue for reparation under paragraphs 8 and 16(2) of the Interstate Commerce Act, 49 U.S.C.A. §§ 8, 16(2). In such case the unlawful charges paid are definite and responsive to the provisions of the Act; but a party may not seek to secure something for itself without proof of pecuniary loss consequent upon the unlawful act. Davis v. Portland Seed Co., 264 U.S. 403, 44 S.Ct. 380, 68 L.Ed. 762.

██ The mere fact that the existence of a conspiracy to raise prices is established is not sufficient ipso facto, to support a judgment for damages under the Sherman Act. This statute differs materially in its provisions from those of the Interstate Commerce Act which insure definite and specific recoveries for departures from published tariffs, and from payments of unreasonable and discriminatory freight rates. It is to be noted that here a recovery is sought for triple damages, a privilege that immediately suggests necessary definiteness in the basis of damages as attributable to the violation of the Federal Act.

Under the contract between appellant and appellee, and the issue stipulated and framed by the pleadings, evidence in regard to both spot market price and service station price was necessary to determine the amount of the margins involved. Appellant offered no testimony on this point, nor any evidence of what the service station price might or would have been in the absence of buying programs. Therefore its sole reliance appears to be upon the testimony of its witness Cox that, in his opinion, the buying program put a floor under the tank car market of 2¼ cents per gallon; and that otherwise the tank car market price would have been 2¼ cents under what it was. There was, therefore, as found by the trial court, a failure to show lessened margins and damages to appellant as a result of the illegal combination charged.

It results that the judgment should be affirmed, and it is so ordered.