## McCOMB v. UNION STOCK YARDS & TRANSIT CO. OF CHICAGO.

### No. 9444.

Circuit Court of Appeals, Seventh Circuit.

May 28, 1948.

William S. Tyson, Sol., Bessie Margolin, Asst. Sol. and Frederick U. Reel, Atty., U. S. Dept. of Labor, all of Washington, D. C., and William A. Lowe, Regional Atty., of Chicago, Ill., for appellant.

Ralph M. Shaw and F. H. Towner, both of Chicago, for appellee.

Before SPARKS and MINTON, Circuit Judges, and LINDLEY, District Judge.

MINTON, Circuit Judge. The Administrator of the Wage and Hour Division sued to enjoin the defendant, Union Stock Yards and Transit Company of Chicago, frcm violating the Fair Labor Standards Act [1] by employing certain watchmen in the yards more hours per week than authorized by the Act, without paying them overtime therefor. There is no question but that the defendant has violated the Act if its watchmen are subject thereto. The District Court held that the defendant was exempt from Section 7 of the Act under Section 13(b) (2)[2] thereof. This judgment was entered pursuant to motions for summary judgment made by both parties. The District Court sustained the motion of the defendant and denied the injunction, and dismissed the plaintiff's complaint. From this judgment the plaintiff has appealed.

The undisputed facts are as follows. The defendant operates and has operated since 1865 in Chicago a stockyards for the receipt and sale of livestock. At present, the yards cover a half section of land almost entirely enclosed by fences and buildings; all the streets and alleyways are private and controlled by the defendant, and the many miles of railroad tracks therein are owned by the defendant and leased to a subsidiary of the New York Central Railroad Company. Trucks deliver about one third of the livestock to the yards, the truckers unloading the livestock into the holding pens. Line haul railroads deliver two thirds of the livestock. On direct con-

---

[1] 29 U.S.C.A. § 201 et seq.  [2] 29 U.S.C.A. § 213(b) (2).

signments of the inbound livestock, usually to the packers, the unloading is done by the defendant, but the consignees take the livestock directly from the unloading pens. On indirect consignments, the inbound livestock is also unloaded by the defendant and then driven from the unloading pens into the holding pens where it is weighed, fed, watered, and cared for until sold and removed from the yards. For outbound shipments over the line haul railroads, the livestock is collected in the holding pens and then driven by the defendant's employees into the loading pens where it is loaded into the cars. The defendant owns all of the chutes, pens, and other facilities for the services it renders. For its loading and unloading charges the defendant files tariffs with the Interstate Commerce Commission, and its charges therefor are collected by the railroads as a part of their total transportation charges, the railroads in turn paying the defendant its share of the total tariff. For its stockyards services other than the loading and unloading, the defendant's charges are regulated by the Secretary of Agriculture.

Within the stockyards area there are four industrial plants, the Drovers Journal Publishing Company and the Pulverized Manure Company, which are closely allied with the yards' operations; the Produce Terminal Corporation, which produces electrical power for sale to the defendant and to the Chicago Junction Railroad, among others; and the Mercury Manufacturing Company, which manufactures industrial equipment and is not allied with the defendant's operations. The yards area is operated as an integrated whole, although the defendant's functions are divided into transportation and stockyards services.

The employees are not separated or regimented as to the services they render but are used when and wherever needed. To protect and police this whole yard and to look after the safety and well being of the animals and of the property therein, the defendant employs approximately fifty watchmen or policemen whose services are here involved. While some of these watchmen are assigned certain posts of duty, including guarding the industrial plants inside the yards, others patrol certain sections of the yards. Any of them may be sent or go to any place in the yards where their services may be required for the guarding and care of the livestock, for the protection of the structures and animals from destruction by fire, and for directing traffic and guarding the gates—in short, doing whatever may be necessary for the operation and protection of the whole area. In emergencies, the watchmen may be required to load and unload livestock.

It is the defendant's contention, and the District Court sustained it, that the watchmen were exempt from the provisions of Section 7 of the Fair Labor Standards Act by the exemption provisions of Section 13 (b) (2), which reads as follows: "(b) The provisions of section 207 of this title shall not apply with respect to * * * (2) any employee of an employer subject to the provisions of sections 1-27 of Title 49."

The statute 49 U.S.C.A. § 1(3) (a) fixes the status of the defendant by including its operations in the definition of a railroad. The part of the statute applicable to the defendant's facilities reads as follows: " * * * and terminal facilities of every kind used or necessary in the transportation of the persons or property designated herein * * *."

In Adams et al. v. Mills, 286 U. S. 397, 409, 52 S.Ct. 589, 76 L.Ed. 1184, the Supreme Court upheld the jurisdiction of the Interstate Commerce Commission to declare unlawful an extra charge of 25¢ per car for unloading livestock in the defendant's yards. The Supreme Court said at page 409 of 286 U. S., at page 592 of 52 S.Ct.: "That the yards are, in effect, terminals of the railroads is clear. They are in fact used as terminals; and necessarily so."

In Union Stock Yards & Transit Co. v. United States et al., 308 U. S. 213, 60 S.Ct. 193, 201, 84 L.Ed. 198, the Supreme Court reviewed the numerous efforts made by the defendant to avoid the jurisdiction of the Interstate Commerce Commission and to avoid the holdings of the Supreme Court that its status was that of a rail terminal. In this case the Supreme Court reaffirmed the holding that the loading and unloading of the livestock in the yards made the defendant a railroad terminal, and the court

sustained the jurisdiction of the Interstate Commerce Commission over such activities. This status of the defendant has been consistently and firmly maintained by the United States. Ever since the passage of the Railroad Retirement Act,[3] the Carriers Taxing Act,[4] and the Railroad Unemployment Insurance Act,[5] the defendant has been required to pay the taxes on its employees imposed by these statutes, including the watchmen here involved, because of its status as a railroad terminal.

The test of the exemption of the employees with which we are here concerned is whether the defendant employer was subject to 49 U.S.C.A. §§ 1–27. The employees' exemption does not depend upon the character of the work performed by them. For the purpose of regulation and the fixing of charges, the defendant is subject to the Interstate Commerce Commission as to loading and unloading services which are part of transportation, while the charges for stockyards services are subject to the jurisdiction of the Secretary of Agriculture. Congress clearly divided the jurisdiction for the purpose of regulating the charges for the services the defendant was performing, but it did not divide the jurisdiction as to the regulation of the wages and hours of the defendant's employees. It made no allocation of employees to transportation and stockyards services when it exempted the employees of an employer subject to 49 U.S.C.A. §§ 1–27.

For us to allocate employees according to the transportation and stockyards services would be for us to amend the exemption section and not to interpret it. In face of the plain provisions of the statutes and the holdings of the Supreme Court and of the administrative agencies of the United States fixing the defendant's status, for us to ignore that status, under the guise of interpreting the plain terms of the exemption statute, would be a usurpation of legislative power we decline to exercise.

█ As far as the watchmen here involved are concerned, their services were not split up between transportation and stockyards. The watchmen were concerned with the safety and protection of the integrated whole of the stockyards. We think that the District Court properly inferred from the whole record that these watchmen "guard defendant's loading and unloading facilities * * *." This loading and unloading took place in an area crisscrossed by many miles of railroad tracks and switches. The area contained hundred of pens, chutes, and other facilities for loading and unloading. There were no boundaries dividing transportation services from stockyards services. A fire, a theft, a depredation, a traffic congestion, or an emergency was of concern to the whole area. The watchmen patrolled the whole area and maintained guard at certain posts for the uniform safety and well being and efficient operation of the whole property, which handled more than eight million head of livestock a year. The entire area was used for transportation services, as it was for stockyards services. "Shipments must be moved with great rapidity and order, and it may be that this can best be done by employees under a single management and discipline. The customary handling over many years led to the building up of a physical plant which the Commission finds makes it physically impossible to remove this stock from the unloading pens except by use of the property of the Yard Company." Swift and Company v. United States, 316 U. S. 216, 226, 227, 62 S.Ct. 948, 954, 86 L.Ed. 1391.

The Administrator has relied heavily upon the Swift case to support his contention that since the defendant acts in a dual capacity, its employees perform dual functions; and since one of the functions is not under the jurisdiction of the Interstate Commerce Commission, the exemption does not apply to any of the employees and they all come under the Fair Labor Standards Act. We are not now concerned with the naked question of whether these employees are within the Fair Labor Standards Act on the theory that if some of their work is interstate and some intrastate, it is all subject to the Fair Labor Standards Act, as we held in McComb v. Blue Star Auto

---

3 45 U.S.C.A. § 228a et seq.

4 26 U.S.C.A.Int.Rev.Code, § 1500 et seq.

5 45 U.S.C.A. § 351 et seq.

378

Stores, Inc., 7 Cir., 164 F.2d 329. In the instant case, we have no question but that all of these employees are engaged in commerce, whatever functions they may perform in transportation or stockyards services. Their status for regulation as to wages and hours does not depend upon whether they are employed much or little in transportation or stockyards services, or both.

■ Under the statute and decisions, it is clear to us that the defendant is a railroad terminal and subject to 49 U.S.C.A. §§ 1–27. Adams et al. v. Mills, supra; Union Stock Yards & Transit Co. v. United States et al., supra; 49 U.S.C.A. §§ 1(3), 15(5). We hold that the watchmen here involved are exempt because they are employees of an employer engaged in the operation of a railroad terminal, and their duties are intimately related to the operation as a whole.

The District Court did not err in denying the injunction, and its judgment is affirmed.