**SCHMITT et al. v. WAR EMERGENCY PIPELINES, Inc., et al.**

No. 13774.

United States Court of Appeals
Eighth Circuit.

June 22, 1949.

Malcolm W. Gannaway and Shields M. Goodwin, Little Rock Ark., for appellant.

John W. Barron, Little Rock, Ark. (A. W. Dobyns, Harry E. Meek, A. F. House, William Nash, G. R. Smith, Little Rock Ark., and J. G. Williamson, Monticello, Ark., on the brief), for appellee.

Before SANBORN, THOMAS and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

To insure adequate supplies of petroleum through the east during the late World War II, the Government caused to be constructed, between the Texas oilfields and the Atlantic seaboard, two large pipelines, commonly known as the "Big Inch" and the "Little Big Inch," respectively.

Ownership of the pipelines was in Defense Plant Corporation, and operation of them was under Defense Supplies Corporation by lease. These were both government corporations, created by Reconstruction Finance Corporation pursuant to the authority of 54 Stat. 572, ch. 427, § 5, 15 U.S.C.A. § 606b.

Construction and operation of the pipelines actually, however, were in the hands of War Emergency Pipelines, Inc., under contracts from Defense Plant and Defense Supplies, constituting Emergency Pipelines as agent, respectively, for these purposes. Emergency Pipelines was a Delaware Cor-

poration, created by eleven of the major oil companies to construct and operate pipelines, with a provision in its articles for cooperation with the Government in any undertaking of this nature, without fee or profit to itself. The only undertaking in which Emergency Pipelines ever engaged was to handle the construction and the operation of the Big Inch and Little Big Inch pipelines, for which, as indicated, it received no fee or profit.

Emergency Pipelines, as agent for Defense Plant, made agreements with outside contractors for the doing of the actual construction work. As a protection both to Defense Plant and to itself, however, it employed a number of persons to receive, check and inspect the materials, supplies, tools, etc. ordered by the contractors, since the construction work was to be done by the latter on a cost-plus-a-fixed-fee basis. Such materials, etc. were received through the channels of interstate commerce. Emergency Pipelines also purchased materials, supplies, tools, etc., as agent for Defense Supplies, for its own use in operating the pipelines, and it similarly employed a number of persons to receive, check, inspect and handle such materials, etc., which too were received through the channels of interstate commerce.

All these employees were paid with funds furnished by Defense Plant and Defense Supplies, respectively, which Emergency Pipelines disbursed by issuing its own checks to the employees. Defense Plant required approval by itself of all personnel employed by Emergency Pipelines in relation to the construction of the pipelines and fixed the salaries and wages which were to be paid. The same was true of Defense Supplies as to all personnel employed by Emergency Pipelines in relation to the operation of the pipelines.

Congress, by Joint Resolution June 30, 1945, 59 Stat. 310, 15 U.S.C.A. § 611 note, dissolved Defense Plant and Defense Supplies, as of July 1, 1945, and made Reconstruction Finance the successor of their assets and their liabilities. Emergency Pipelines relinquished its operation and control of the pipelines to Reconstruction Finance on January 31, 1946. It accounted to Reconstruction Finance for the earnings of the pipelines (approximately $180,000,000) during its operation of them and began to take steps toward its own dissolution.

The present action, brought after the relinquishment of the pipelines to Reconstruction Finance, is one against Emergency Pipelines and Reconstruction Finance, to recover overtime compensation, liquidated damages and attorneys fees, under section 16(b) of the Fair Labor Standards Act, 29 U.S.C.A. § 216(b), on the part of the employees referred to above—those whom Emergency Pipelines had engaged to check the materials, etc. used in the construction work, and those whom it had engaged to check the materials, etc. used in the operation of the pipelines. The services involved had all been performed subsequent to December 31, 1942, the date on which Emergency Pipelines began using the Big Inch pipeline in interstate oil-transportation.

The trial court, on a hearing, denied recovery and entered judgment in favor of Emergency Pipelines and Reconstruction Finance. The employees have appealed. We think the judgment must be affirmed.

The basis of the trial Court's decision was that, irrespective of any other question inhering in the situation, the employees could have no possible right to recover overtime benefits under the Fair Labor Standards Act, because 29 U.S.C.A. § 213(b) (2) expressly provided that the overtime prescriptions of 29 U.S.C.A. § 207 "shall not apply with respect to * * * any employee of an employer subject to the provisions of Part I of the Interstate Commerce Act," 49 U.S.C.A. §§ 1–27.

■ Under 49 U.S.C.A. § 1(1) and (3), "all pipeline companies," engaged in the interstate transportation of oil, whether they are common carriers for hire or not, are subject to Part I of the Interstate Commerce Act. They are so subject, even though they merely transport their own products for commercial use. Valvoline Oil Co. v. United States, 308 U.S. 141, 60 S.Ct. 160, 84 L.Ed. 151; Champlin Refining Co. v. United States, 329 U.S. 29, 67 S.Ct. 1, 91 L.Ed. 22.

■ Appellants argue, however, that Emergency Pipelines could not be regarded

as a pipeline company, because "it neither owned nor held any interest" in the Big Inch or Little Big Inch pipelines. But it had possession and control of the pipelines, and it operated them. It was the one that was doing the interstate transporting of oil with them. Such private industrial or employeral status as it had at the time the services here involved were performed (and appellants are asserting that such a status existed) clearly was of the pipeline business. We think it indisputable, under 49 U.S.C.A. § 1(3), that anyone who controls a pipeline, whether through ownership, by lease, or on any other possessory basis, and operates it as a facility for the interstate transporting of oil is a pipeline company for the purposes of Part I of the Interstate Commerce Act.

■ Here, as with any other carrier subject to that part of the Act, the criterion is control and use of facilities and not simply ownership. Cf. Ellis v. Interstate Commerce Commission, 237 U.S. 434, 444, 35 S. Ct. 645, 59 L.Ed. 1036. The argument made by appellants in the present situation has in effect been urged as to other forms of carriers and has been rejected. See Powell v. United States, 300 U.S. 276, 57 S.Ct. 470, 81 L.Ed. 643. Indeed, the statute itself uses the language, "irrespective of ownership or of any contract, express or implied, for the use thereof," in its detailing of the carrier facilities encompassed by the term "transportation" for purposes of the Act. 49 U.S.C.A. § 1(3).

But appellants further contend that, even if Emergency Pipelines' operation of the pipelines was exempt from the overtime provisions of the Fair Labor Standards Act, in view of 29 U.S.C.A. § 213(b) (2), the exemption should be regarded as extending only to those engaged in checking the materials, etc. used in the operation of the pipelines and not to those engaged in checking the materials, etc. used in the construction work.

As has been noted, the language of 29 U.S.C.A. § 213(b) (2) is that the overtime provisions of the Fair Labor Standards Act "shall not apply with respect to * * * any employee of an employer subject to the provisions of Part I of the Interstate Commerce Act," 49 U.S.C.A. §§ 1–27. Granting that the term "any employee" should not be given a literal significance, so as to extend the exemption to any activity by a carrier which is wholly extraneous to its sphere of carrier functioning, this still in the present situation would not leave outside the exemption the employees of Emergency Pipelines who were engaged in checking the materials, etc. for the construction work that is here involved.

All of the construction work involved, as we have indicated above, was work that was done after Emergency Pipelines had begun to operate the Big Inch pipeline in interstate oil-transportation and thereby (in so far as it had the industrial and employeral status which appellants assert against it) had become a common carrier under Part I of the Interstate Commerce Act. Part of the construction work consisted simply in the extension or projection of the Big Inch pipeline beyond its original terminus. The rest went into the building of the supplementary or auxiliary Little Big Inch pipeline. (It is admitted here that the checking of the materials, etc. bore such an intimate relationship to, as to be a part of, the construction work itself.)

■ All the construction work thus merely went to increase the pipeline facilities, and in relation to Emergency Pipelines' intended and actual operation of them served only to enlarge the scope of the latter's carrier activity. This plainly was what Defense Plant, Defense Supplies and Emergency Pipelines all were seeking to accomplish, for even the initial contract between Defense Plant and Emergency Pipelines for the construction of the Big Inch pipeline had recited that it was contemplated that Emergency Pipelines was to operate the pipeline. In sound practical aspect, therefore, the employees of Emergency Pipelines engaged in the construction work involved were in the same position and relationship as the employees of a railroad, for example, who are engaged in extending its lines, adding to its tracks, or otherwise augmenting or improving its interstate carrier facilities. Such employees, beyond any question, are within the exemp-

tion of 29 U.S.C.A. § 213(b) (2) from the Fair Labor Standards Act's overtime provisions. Cf. McComb v. Union Stock Yards & Transit Co., 7 Cir., 168 F.2d 375.

The views expressed make unnecessary any discussion of the other contentions urged.

Affirmed.