The **PHILADELPHIA HOUSING AUTHORITY et al.**

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION et al.**

Vincent A. **MANGANO et al.** and Edward S. Petros et al.

v.

**AMERICAN RADIATOR & STANDARD SANITARY CORPORATION et al.**

Civ. A. Nos. 41773, 69–861.

United States District Court, E. D. Pennsylvania.

April 6, 1970.

See also D.C., 309 F.Supp. 1053.

Paul D. Scanlon, McLean, Va., for plaintiffs.

Fred A. Freund, New York City, for defendants.

## OPINION AND ORDER

JOHN W. LORD, Jr., Chief Judge.

Before the Court in the above-entitled treble damage antitrust action is the motion of defendant Wallace-Murray Corporation, joined in by several other defendants, to dismiss. The instant case is one of approximately two hundred and thirty-five cases arising from an alleged conspiracy to fix the prices of certain plumbing fixtures now before this Court for consolidated pretrial proceedings pursuant to 28 U.S.C.A. § 1407.

Defendants' motion to dismiss is based on the failure of plaintiffs to file answers to interrogatories and rests on two grounds. Defendants first contend that plaintiffs' flagrant violation of the Federal Rules of Civil Procedure and of the Court's directive that they file full and complete answers to interrogatories is in itself sufficient to justify dismissal of plaintiffs' claims. Secondly, defendants argue that even if this sanction were not justified, the Court would clearly be justified in imposing the weaker sanction of presuming that the answers to certain interrogatories which plaintiffs failed to answer would be adverse to plaintiffs' interest, and that such a presumption, because of the applicable substantive law, requires the dismissal of plaintiffs' claims.

On April 18, 1969, the Court entered a Stipulation and Protective Order reflecting certain agreements of the parties in, *inter alia,* the case now before the Court. In this Stipulation and Pro-

tective Order, defendants agreed to answer certain interrogatories of plaintiffs as modified therein within a period of five months. Defendants completed and filed these answers within this period. At the same time plaintiffs agreed to answer Defendants' Interrogatories, Sets No. 1 (as modified therein) and No. 2, within five months, so that answers to these interrogatories became due on September 18, 1969. However, on September 11, 1969, plaintiffs moved for an additional 120 days in which to answer. Defendants indicated that they would oppose this motion. As a resolution of these differences, plaintiffs and defendants agreed to the following Order entered by this Court on September 23, 1969:

"The motion of plaintiffs and intervenor-plaintiffs for additional time within which to answer Defendants' Interrogatories to Plaintiffs, Sets No. 1 and No. 2, in compliance with the provisions of the stipulations and protective orders dated April 18, 1969 and May 21, 1969, IS GRANTED only to the following extent:

"Plaintiffs and intervenor-plaintiffs shall file full and complete answers to defendants' interrogatories on or before November 17, 1969. Upon failure to do so, defendants may file a motion to dismiss with respect to such plaintiff or intervenor-plaintiff."

It is now more than four months beyond the date upon which answers to these interrogatories became due pursuant to the above Order of this Court. Nevertheless, none of the plaintiffs in the instant actions has filed any answers whatsoever to Defendants' Interrogatories, Set No. 2. Furthermore, plaintiffs' answers to Defendants' Interrogatories are totally inadequate and fail to provide essential information critical to the determination of which, if any, of the many plaintiffs in the present litigation are entitled to recover damages. Much of this information is peculiarly important in the cases of the

instant plaintiffs, who claim to represent a nationwide class of homeowners, because of their position in the chain of distribution of plumbing fixtures.

Three plaintiffs have failed to file answers to any interrogatories, but these plaintiffs have apparently indicated "that they no longer wish to participate as plaintiffs." [1] Each of the other plaintiffs [2] in these two actions has filed a thirty-one page set of answers to interrogatories. Twenty-six of the thirty-one pages are identical in every case. These twenty-six pages consist of an introductory "Explanatory Statement", which gives the definitions of certain terms such as *"Don't know"* and *"Don't recall"* and a twenty-four page section entitled "Part II." Part II consists of identical responses on the part of each plaintiff, even to the extent of including identical typographical errors, to twenty-seven interrogatories. The remaining pages include those answers in which the responses of the various plaintiffs differ. For the most part these are simply brief answers of a few words giving the name and address of the plaintiff, the year plaintiff's house was built, purchased, and/or renovated, the number of bathrooms plus an indication that the house contains a steel kitchen sink, and the name of the manufacturer. [3]

Plaintiffs' answers fail to give virtually any of the essential information sought by defendants through these interrogatories, particularly that which bears on the critical issue of which of the many plaintiffs asserting competing claims may be entitled to recover damages. For example, plaintiffs fail to provide essential information bearing on defendants' contention that the price charged for a home was in no way governed by the cost of its plumbing fixtures. [4] None of plaintiffs' answers give any information as to the price paid either for the plumbing fixtures or the homes containing them. When asked in Interrogatory 55(d) for the total order price, each plaintiff answered, "Inapplicable unless answered otherwise." No plaintiff "answered otherwise." When asked in Interrogatory 55(e) for the total price actually paid, each plaintiff answered, "Part of sales price of house unless otherwise specified." No plaintiff "otherwise specified." Nor did any plaintiff give the sales price of the house. While plaintiffs could conceivably argue that the above portions of interrogatories required a statement of the total price paid only where the plumbing fixtures were purchased as such and not as part of houses, such an argument affords them no help here. For when asked specifically in Interrogatory 55(p) for the total contract price in cases in which plaintiffs did not purchase plumbing fixtures as such, each plaintiff answered, "Not applicable."

Similarly, plaintiffs' answers provide no information as to how the prices they paid for plumbing fixtures or for houses were arrived at, which factor also has important bearing on relative rights of

---

1. Plaintiffs' brief, pp. 1–2.

2. Defendants claim that twenty wives who are plaintiffs with their husbands through ownership in tenancies by the entirety have not filed answers because they have not signed the answers filed by their husbands. Plaintiffs claim these signatures are unnecessary. In light of the disposition of the present motion by the Court, it is not necessary to resolve this dispute.

3. A few plaintiffs did supply a little additional information. While each plaintiff who filed answers simply answered in-

terrogatory 55(h) (ii), which asks for the name and address of the person from whom he purchased plumbing fixtures, with the response "prior owner", a few did supply a little additional information relevant to this question through answers to other interrogatories. However, the information supplied was minimal, and none of the answers even indicated that a plaintiff took the trouble to examine his deed. See Defendants' Affidavit, p. 9.

4. See discussion of applicable substantive law, *infra*.

plaintiffs with competing claims.[5] Each plaintiff simply answered the portions of interrogatories requesting such information, "Not applicable." While it is possible that some of the present plaintiffs could not readily obtain this information, none of them even adequately answered defendants' interrogatory requesting the name and address of the person from whom they purchased, who might have this information. When asked in Interrogatory 55(h) (ii) for the name of the person from whom he purchased his plumbing fixtures, each plaintiff informatively answered, "Prior owner.[6]" To Interrogatory 55(g), which asks each plaintiff who did not purchase plumbing fixtures to give the name, address and relationship to the plaintiff of the person who did make the purchases, each plaintiff responded, "Prior owner of property. See more detailed answer if available." No plaintiff provided a more detailed answer. (See footnote 6).

The answers of plaintiffs to interrogatories dealing with the types and identification of plumbing fixtures they own and many other answers given by them are equally inadequate. The Court will not deal with them further in detail. As has been indicated above, the bulk of the answers are identical in every respect, despite the factual differences which would be expected in a group of plaintiffs purporting to advance claims representative of a national class of homeowners and with evident varying degrees of access to some of the information sought.[7] Nor will the Court deal in detail with plaintiffs' argument that defendants could or should get the essential information necessary in the

case from reports of the United States Bureau of the Census or of other government agencies. The Court rejects such a contention raised at this state of the proceedings after the prior Orders of the Court without further discussion. Similarly, plaintiffs' bare assertions that much of the information sought is irrelevant at the present time and that Set No. 2 is merely a means of harassment, particularly coming after plaintiffs' express agreement to furnish full and complete answers to both Sets, are unpersuasive. *Accord,* Bourgeois v. El Paso Natural Gas Co., 20 F.R.D. 358 (S.D.N.Y.1957).[8]

Rule 37(a) Fed.R.Civ.P. provides in part:

"(a) *Refusal to Answer.* If a party or other deponent refuses to answer any question propounded upon oral examination, the examination shall be completed on other matters or adjourned, as the proponent of the question may prefer. Thereafter, on reasonable notice to all persons affected thereby, he may apply to the court in the district where the deposition is taken for an order compelling an answer. Upon the refusal of a deponent to answer any interrogatory submitted under Rule 31 or upon the refusal of a party to answer any interrogatory submitted under Rule 33, the proponent of the question may on like notice make like application for such an order. * * *"

In the instant case, plaintiffs expressly agreed to the entry of an Order directing them to answer by a specified extended date and authorizing defendants to file motions to dismiss in the event of noncompliance.

---

5. See discussion of applicable substantive law, *infra.*

6. See footnote 3.

7. For example, a number of the plaintiffs in the present action are builders themselves and as such are plaintiffs in a home builders action also among the cases consolidated before this Court (Civil Ac-

tion 69–181). But the same "Part II" included in these answers is included in their responses in those cases.

8. Any questions regarding the propriety of defendants' interrogatories were resolved by the Stipulation and Protective Order of April 18, 1969 and the Order of September 23, 1969.

Rule 37(b), which sets forth the sanctions for failure to comply with such an Order provides in Part:

"(b) *Failure to Comply With Order*.

"(1) *Contempt*.

\* \* \* \* \* \*

"(2) *Other Consequences*. If any party or an officer or managing agent of a party refuses to obey an order made under subdivision (a) of this rule requiring him to answer designated questions, \* \* \* the court may make such orders in regard to the refusal as are just, and among others the following:

"(i) An order that the matters regarding which the questions were asked, or the character or description of the thing or land, or the contents of the paper, or the physical or mental condition of· the party, or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

"(ii) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing in evidence designated documents or things or items of testimony, or from introducing evidence of physical or mental condition;

"(iii) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party; \* \* "

Rule 37(d) provides analogous sanctions for failure to answer interrogatories even in the absence of such an Order, but does not authorize a finding of contempt of court. In the instant case, plaintiffs failed entirely to comply with the Court's Order requiring "full and complete" answers to Defendants' Interrogatories, Sets No. 1 and 2. As has been indicated plaintiffs filed no answers whatsoever to Set No. 2 of Defendants' Interrogatories. And plaintiffs have virtually failed entirely to answer the bulk of the interrogatories in Set No. 1. For an answer of "Not applicable" by a party to whom a given interrogatory is clearly applicable by its terms is the equivalent of a failure to answer. The same can be said of an answer like "available for physical inspection,[9] " where the answering party has given no reason as to why it has not supplied the information sought which it has agreed to give. Similar remarks apply to many of plaintiffs' "Don't recall" answers. Discovery procedures cannot be frustrated by such transparent sham. Life Music, Inc. v. Broadcast Music, Inc., 41 F.R.D. 16, 24 (S.D.N.Y.1966). In light of the flagrant disregard by plaintiffs of the discovery requirements of the Federal Rules of Civil Procedure and of the Order of this Court, the Court would be fully justified if, in the exercise of its discretion, it were to dismiss the claims of the present plaintiffs on the basis under Rule 37(b) (2) (iii) or 37(d). Brookdale Mill, Inc. v. Rowley, 218 F.2d 728 (6th Cir. 1954); Fond Du Lac Plaza,

9. Plaintiffs gave this response to Interrogatory 56(b) and similar responses to a number of other questions also relating to the identification of the type of plumbing fixtures they own. In their Explanatory Statement, they indicate that this term means that the subject matter will be made available for inspection to defendants if the latter secure a proper order from the Court pursuant to Rule 34 of the Federal Rules of Civil Procedure. Apparently plaintiffs are claiming that defendants must go around to every home containing plumbing fixtures with regard to which a claim is made and inspect the fixtures. Aside from the obvious impracticality of such inspections of every home by defendants, such an answer to an interrogatory plaintiffs have agreed to answer is clearly improper.

Inc. v. Reid, 47 F.R.D. 221 (E.D.Wis. 1969); Shepard v. General Motors Corporation, 42 F.R.D. 425 (D.N.H.1967); *Accord,* Hastings v. Maritime Overseas Corporation, 411 F.2d 1201 (3rd Cir. 1969); Diapulse Corporation of America v. Curtis Publishing Co., 374 F.2d 442 (2nd Cir. 1967); United States of America for the Use of Weston & Brooker Co. v. Continental Casualty Co., 303 F.2d 91 (4th Cir. 1962); Brady v. Hearst Corporation, 281 F.Supp. 637 (D.Mass.1968). Such action is particularly appropriate in complex antitrust litigation like that now before the Court where efficient and effective discovery procedures are essential to orderly adjudication. Trans World Airlines, Inc. v. Hughes, 332 F.2d 602, 615 (2nd Cir. 1964).

However, it is not necessary to dispose of the instant case on this basis. For even if plaintiffs' blatant failure to file full and complete answers to interrogatories did not in itself warrant dismissal of plaintiffs' claims under Rule 37(b) (2) (iii) or 37(d), *supra,* there can be no doubt that it clearly warrants the sanctions of Rule 37(b) (2) (ii), *supra,* and the Court believes that even the latter sanction requires the dismissal of plaintiffs' claims because of the applicable *substantive law.*[10] That is, plaintiffs' failure to answer important interrogatories clearly warrants a ruling by the Court that the matters regarding which those questions were asked be taken to be established in accordance with the claims of defendants. McMullen v. Travelers Insurance Co., 278 F.2d 834 (9th Cir. 1960); Life Music, Inc. v. Broadcast Music, Inc., 41 F.R.D. 16 (S.D. N.Y.1966). In particular, the Court

agrees with defendants that because of plaintiffs' failure through their answers to interrogatories to provide information to the contrary, the following facts should be presumed,[11] and the Court so rules:

1) That each of the present plaintiffs bought a house containing plumbing fixtures rather than plumbing fixtures as such.

2) That the present plaintiffs did not make their purchases pursuant to a preexisting cost-plus contract or analogous fixed markup type of arrangement.

But the Court believes, in addition, that such presumptions undermine the substantive basis of plaintiffs' claims.

The substantive basis of the claims of each of the present plaintiffs rests on the premises that:

1) When the wholesaler purchased the plumbing fixtures ultimately used in the construction of that plaintiff's house, the price paid included an unlawful overcharge.

2) When the wholesaler sold those plumbing fixtures to the plumbing contractor, it passed on the overcharge to the latter.

3) When the plumbing contractor sold those plumbing fixtures to the builder who constructed plaintiff's home, it passed on the overcharge to the builder.

4) When the builder incorporated those plumbing fixtures in the home it constructed, it passed on the overcharge to the purchasing homeowner.

---

10. The sanctions of Rule 37(b) (2) (ii) are not limited in application to non-dispositive issues. McMullen v. Travelers Insurance Co., 278 F.2d 834 (9th Cir. 1960).

11. The interrogatories directed to these facts and the answers thereto have been previously discussed.

It may be that presuming the first of these facts to be true is simply accepting plaintiffs' answer rather than assuming a fact to be true because of failure to furnish information to the contrary. See plaintiffs' answer to Interrogatory 55(e) and discussion relating thereto, *supra.* See, however, plaintiffs' answer to Interrogatory 55(p).

5) Where the plaintiff homeowner bought his home from a prior homeowner, that such prior homeowner passed the overcharge on to the plaintiff.

The doubtfulness of the economic connection between the initial overcharge, if any, and the price paid by remote purchasers, in the case of successive independent markets, together with the complex problems of proof of such "passing-on" of the overcharge, have led the courts to develop certain limitations on the extent to which speculation on this connection can be permitted. Consideration of this development is therefore necessary here.

The development of the law with respect to the "passing-on" problem has been long and tortuous, and it is difficult if not impossible to fully reconcile all of the cases dealing with it. The problem first received judicial attention in the case of Chattanooga Foundry and Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). That was a suit brought by the City of Atlanta to recover treble damages for overcharges on the price of iron water pipe used in its waterworks. Without making its reasoning explicit, the Supreme Court per Mr. Justice Holmes affirmed a verdict for the city in an amount determined on the basis of the difference between the price actually paid and the market price that the city would have had to pay in the absence of the unlawful conspiracy. *Id.* at 396, 27 S.Ct. 65. The Court did not require a showing by the city that it had borne the full impact of the overcharges itself rather than passed some or all of the additional cost on to others in the form of increased water rates or otherwise.

Twelve years later in Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 38 S.Ct. 186, 62 L.Ed. 451 (1918), Mr. Justice Holmes made explicit the position and supporting reasoning which underlay the decision in *Chattanooga*. The *Darnell-Taenzer* case was a suit to recover freight overcharges from the defendant railroads under the Interstate Commerce Act. In ruling that plaintiff shippers could recover from defendants the amount of the difference between the rate to which they were entitled and the rate they were compelled to pay, regardless of whether the shippers had passed the excess charges on to their own customers, the Court stated at pages 533–534, 38 S.Ct. at 186:

"The only question before us is that at which we have hinted: whether the fact that the plaintiffs were able to pass on the damage that they sustained in the first instance by paying the unreasonable charge, and to collect that amount from the purchasers, prevents their recovering the overpayment from the carriers. The answer is not difficult. The general tendency of the law, in regard to damages at least, is not to go beyond the first step. *As it does not attribute remote consequences to a defendant so it holds him liable if proximately the plaintiff has suffered a loss.* * * * [emphasis added].

It is especially significant that the Court in the above passage correlated its rejection of the passing-on defense as against plaintiff with a corresponding rejection of a right to recover by more remote purchasers. The Court emphasized as a basis for these views, "the endlessness and futility of the effort to follow every transaction to its ultimate result." *Id.* at 534, 38 S.Ct. at 186.

An exception to the consistent refusal of the courts to recognize a passing-on defense was carved out in the so-called "oil jobber" cases. After the Government in 1940 had successfully prosecuted several major oil companies for conspiring to fix prices to oil and gasoline jobbers (United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)), several of these jobbers brought civil treble damage actions against the oil companies. These jobbers, who were in the business of resell-

ing oil and gasoline to gasoline service stations, determined their retail price on the basis of a fixed "margin" or specified figure added to the wholesale price. Plaintiff jobbers were able to maintain this fixed markup because the defendant oil companies controlled not only the price at which they sold to plaintiffs but also the price at which plaintiffs sold to the service stations. In fact in many cases defendants had guaranteed plaintiffs' profit margins. Relying on the fact that plaintiffs operated on a fixed markup basis as well as the fact that the jobbers did not resell in a new and unrestrained market but in one strictly controlled by the defendants, the courts held in a series of cases that plaintiffs could not recover because they had passed any increased cost on to their own customers. See *e. g.*, Clark Oil Co. v. Phillips Petroleum Co., 148 F.2d 580 (8th Cir.), cert. denied, 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945); Northwestern Oil Co. v. Socony-Vacuum Oil Co., 138 F.2d 967 (7th Cir. 1943), cert. denied, 321 U. S. 792, 64 S.Ct. 790, 88 L.Ed. 1081 (1944); Twin Ports Oil Co. v. Pure Oil Co., 119 F.2d 747 (8th Cir.), cert. denied, 314 U.S. 644, 62 S.Ct. 84, 86 L.Ed. 516, petition for rehearing denied, 314 U.S. 711, 62 S.Ct. 176, 86 L.Ed. 567 (1941); Leonard v. Socony-Vacuum Oil Co., 42 F.Supp. 369 (W.D.Wis.), appeal dismissed, 130 F.2d 535 (7th Cir. 1942).

In addition to the fixed markup and the controlled market factors, the courts in the oiler jobber cases relied in part on a view based on dictum [12] in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922) and on their interpretation of Interstate Commerce Comm'n v. United States, ex rel. Campbell, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933). See *e. g.*, Northwestern Oil Co v. Socony-Vacuum Oil Co., *supra*, 138 F.2d at 970, Clark Oil Co. v. Phillips Petroleum Co., *supra*, 148 F.2d at 582; Twin Ports Oil Co. v. Pure Oil Co., *supra*, 119 F.2d at 750–751. Under that view the *Darnell-Taenzer* case, to the extent that it represented a sweeping rejection of the passing-on defense, was limited in application to Interstate Commerce Act cases. One court took the position that the *Chattanooga* case, *supra*, evidenced a different position with respect to antitrust cases. *Northwestern Oil Co., supra*, 138 F.2d at 970. However, as this Court has indicated above, the view implicit in the *Chattanooga* case is the same as that made explicit in *Darnell-Taenzer*. Moreover, the distinction which was utilized by the courts in the oiler jobber cases has been repeatedly and consistently rejected in subsequent cases. See *e. g.* Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 491–492 and 490, 88 S.Ct. 2224, 20 L.Ed.2d 1231 n. 8 (1968); Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 65–67 (S.D.N.Y.); interlocutory appeal refused, 337 F.2d 844 (2nd Cir. 1964); Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F.Supp. 826, 830 n. 8 (M.D.Pa.), affirmed per curiam 281 F.2d 481 (3rd Cir.), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed. 2d 194 (1960). In the *Atlantic City Electric Co.* case, for example, Judge Feinberg pointed out that the language of the Court in *Darnell-Taenzer* quoted above was very broad and not confined to the measure of recovery under the Interstate Commerce Act. He noted the Court's reference in *Darnell-Taenzer* to the general rule which prevents attributing remote consequences to a defendant and as a corollary holds a defendant liable to a plaintiff which it causes to suffer a proximate loss. Judge Feinberg rejected the view that the dictum in *Keogh* and opinion in the *Interstate Commerce* case limited the impact of *Darnell-Taenzer* to cases under the Interstate Commerce Act. Defendants in *Atlantic*

12. See discussion of *Keogh* in Atlantic City Electric Co. v. General Electric Co., 226 F.Supp. 59, 65–66 (S.D.N.Y.); interlocutory appeal refused, 337 F.2d 844 (2nd Cir. 1964).

*City* took the position that a reparation order of the Interstate Commerce Commission is enforced without any factual inquiry into the pecuniary loss of plaintiff, whereas the right of recovery under the Clayton Act is dependent upon specific proof of pecuniary loss. But Judge Feinberg stated that the real distinction in the *Interstate Commerce* case was not between cases under the Interstate Commerce Act and those under the Clayton Act but rather between those dealing with overcharges under either act on the one hand and those dealing with rate discrimination on the other. And the court pointed out that the view of defendants that the decision in *Darnell-Taenzer* was based on the position that in cases under the Interstate Commerce Act plaintiff need not show any loss was erroneous. Atlantic City Electric Co. v. General Electric Co., *supra*, 226 F.Supp. at 65. Judge Feinberg concluded that the decision and rationale of *Darnell-Taenzer* are applicable to Clayton Act cases.

A major attempt to reconcile the oil jobber cases with *Darnell-Taenzer* and *Chattanooga* was made by Judge Goodrich in the case of Hanover Shoe, Inc. v. United Shoe Machinery Corp., 185 F. Supp. 826 (M.D.Pa.), affirmed per curiam, 281 F.2d 481 (3rd Cir.), cert. denied, 364 U.S. 901, 81 S.Ct. 234, 5 L.Ed.2d 194 (1960). In that treble damage action, the plaintiff shoe manufacturer alleged a violation of the Clayton Act based on defendant's policy of only leasing and refusing to sell its shoe manufacturing machinery, which practice plaintiff claimed resulted in an illegal overcharge on the price for use of the machinery. United defended on the ground that even assuming that plaintiff had been charged too much, plaintiff had no right to recover because it (plaintiff) had passed the overcharge on to the people to whom it sold shoes manufactured through the use of defendant's machinery. Plaintiff's response was that it did not resell the shoe machinery but used it to produce shoes, and that any increases in the prices it charged for shoes were the result of competition in an entirely independent market and were unrelated to the excessive amount it had to pay for the use of defendant's equipment.

Because of the possibility that a determination of this question might be critical in the resolution of the entire litigation, the issue was set for separate determination pursuant to 42(b) Fed.R.Civ.P. After evidence had been taken on this issue, Judge Goodrich, sitting by special designation, rejected defendant's contention. Relying in large measure on *Darnell-Taenzer* and specifically quoting the above-quoted passage of that opinion which correlates rejection of attributing remote consequences to a defendant with holding such a defendant liable for losses it proximately causes, the court ruled that plaintiff could recover the full amount of the overcharge without further inquiry into the question of whether plaintiff might have passed on the excess cost to its customers. The court distinguished the oil jobber cases on the basis that plaintiff in the case before it was a "consumer" of the product sold to it whereas the plaintiffs in the oil jobber cases were "middlemen" and stated:

"* * * where the plaintiff is a consumer of the product, rather than a middleman who resells it, he may recover the excess paid whether or not he has ultimately passed the excess along to his customers. Plaintiff herein was such a consumer." *Id.* 185 F.Supp. at 831.

Judge Goodrich's decision was affirmed per curiam by the Third Circuit (281 F. 2d 481) and the Supreme Court denied certiorari (364 U.S. 901, 81 S.Ct. 234, 5 L.Ed.2d 194).

The Third Circuit applied Judge Goodrich's middleman-consumer distinction in Freedman v. Philadelphia Terminals Auction Co., 301 F.2d 830 (3rd Cir. 1962). Defendant in that case operated an auction market in Philadelphia for the sale at wholesale of fresh fruit arriving by railroad from out of state. Two of

the plaintiffs were brokers who purchased fruit at defendant's auctions on behalf of regular clients. They paid the purchase price and billed their clients for the amount paid plus their commission of five or ten cents per box of fruit. A third plaintiff was primarily a wholesaler who purchased fruit at defendant's auctions for his own account and resold it to customers at his store. During an eight year period from 1948 to 1956 the defendant paid the railroads in addition to the ordinary freight charges an unloading charge. To cover these charges, defendant collected from the auction buyers a terminal charge of a fixed amount per box of fruit, but the amounts collected as terminal charges exceeded the amounts paid to the railroads as unloading charges. Plaintiffs brought suit charging *inter alia* a violation of Section 2(c) of the Clayton Act. The jury found that defendant had not violated Section 2(c) and found that in any event plaintiffs had not been injured in their business or property. Plaintiffs appealed and argued first, that there was indeed a violation, and second, that they were entitled to recover the amounts illegally collected.

The Court of Appeals found it necessary to deal only with the second of these points. It ruled that the jury could reasonably conclude that plaintiffs passed on the terminal charges to their clients and customers and that therefore the charges did not result in a reduction of the volume of plaintiffs' business. The court pointed out that it was undisputed that the broker plaintiffs specifically included the terminal charges in the billing statements to their clients, and sometimes, with the consent of the clients, a little more. Similarly the court pointed out that the third plaintiff maintained his desired markup by including the terminal charges in computing his resale price. The court quoted the relevant section of the District Court's opinion in *Hanover* setting forth the middleman-consumer distinction. However, it ruled

that plaintiffs were clearly middlemen and not consumers in any sense in contrast to the *Hanover* plaintiff and concluded therefore that plaintiffs were barred from recovery by the above findings with respect to pass-on. The court therefore found it unnecessary to determine whether there had been a violation of the Clayton Act.

Judge Feinberg, in Atlantic City Electric Co. v. General Electric Co., 226 F. Supp. 59 (S.D.N.Y.), interlocutory appeal refused, 337 F.2d 844 (2nd Cir. 1964), presented the first thorough analysis of the underlying rationale of the middleman-consumer distinction which had been enunciated in *Hanover Shoe* and utilized by the *Freedman* court. In an extremely thorough opinion reviewing and attempting to reconcile with great care the holdings of all of the previous cases while bringing out certain conflicting economic approaches underlying them, Judge Feinberg stated at 226 F. Supp. at pages 68–69:

"The 'middleman-consumer' distinction has been criticized as having 'no economic significance' since a consumer (i. e., a manufacturer) can, as effectively as a pure middleman, recover an excessive price by raising the price of the commodity he sells. *However, proof of the manner in which increased cost is passed on is unquestionably more difficult in the case of a manufactured article than in the oil jobber cases. With a manufacturer (in the instant case, of electricity), the cost of the item bought from defendant is only one of many variable factors in the determination of the price of the finished product to the consumer. Moreover, recouping of the excessive cost depends upon how well the plaintiff manufacturer performs in his own business, with the accounting and evidentiary problems this raises.* In the oil jobber cases, the effect of the increased cost on the price of gasoline and the manner in which the increased cost was recouped were both

easily identifiable." [emphasis added and footnotes omitted].

The long development of the pass-on problem culminated in the most authoritative disposition of the issue when the Supreme Court decided the *Hanover Shoe* case. Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). Following Judge Goodrich's determination of this issue in the separate proceeding under Rule 42(b) discussed above, the affirmance of his decision by the Third Circuit and the denial of certiorari by the Supreme Court, the case proceeded to trial. After an adverse decision at trial on the merits, the defendant, United, preserved the issue and presented it again to the Court of Appeals, which followed its prior reasoning on the issue. The Supreme Court then granted certiorari. 389 U.S. 818, 88 S.Ct. 86, 19 L.Ed.2d 68 (1967).

The Supreme Court affirmed the decision of the district and circuit courts on the passing-on issue. Considering the problem at length, the Supreme Court stated in part:

"Section 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 15, provides that any person 'who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor * * * and shall recover threefold the damages by him sustained * * *.' We think it sound to hold that when a buyer shows that the price paid by him for materials purchased for use in his business is illegally high and also shows the amount of the overcharge, he has made out a prima facie case of injury and damage within the meaning of § 4.

If in the face of the overcharge the buyer does nothing and absorbs the loss, he is entitled to treble damages. This much seems conceded. The reason is that he has paid more than he should and his property has been illegally diminished, for had the price paid been lower his profits would have been higher. It is also clear that if the buyer, responding to the illegal price, maintains his own price but takes steps to increase his volume or to decrease other costs, his right to damages is not destroyed. Though he may manage to maintain his profit level, he would have made more if his purchases from the defendant had cost him less. *We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower.*

"Fundamentally, this is the view stated by Mr. Justice Holmes in Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906), where Atlanta sued the defendants for treble damages for antitrust violations in connection with the city's purchase of pipe for its waterworks system. The Court affirmed a judgment in favor of the city for an amount measured by the difference between the price paid and what the market or fair price would have been had the sellers not combined, the Court saying that the city 'was injured in its property, at least, if not in its business of furnishing water, by being led to pay more than the worth of the pipe. A person whose property is diminished by a payment of money wrongfully induced is injured in his property.' *Id.*, at 396, 27 S.Ct. 65. The same approach was evident in Thomsen v. Cayser, 243 U.S. 66, 37 S.Ct. 353, 61 L.Ed. 597 (1917), another treble-damage antitrust case. With respect to overcharge cases arising under the transportation laws, similar views were expressed by Mr. Justice Holmes in Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533, 38

S.Ct. 186, 62 L.Ed. 451 (1918), and by Mr. Justice Brandeis in Adams v. Mills, 286 U.S. 397, 406–408, 52 S.Ct. 589, 591–592, 76 L.Ed. 1184 (1932). In those cases the possibility that plaintiffs had recouped the overcharges from their customers was held irrelevant in assessing damages.

"United seeks to limit the general principle that the victim of an overcharge is damaged within the meaning of § 4 to the extent of that overcharge. The rule, United argues, should be subject to the defense that economic circumstances were such that the overcharged buyer could only charge his customers a higher price *because* the price to him was higher. It is argued that in such circumstances the buyer suffers no loss from the overcharge. This situation might be present, it is said, where the overcharge is imposed equally on all of a buyer's competitors and where the demand for the buyer's product is so inelastic that the buyer and his competitors could all increase their prices by the amount of the cost increase without suffering a consequent decline in sales.

"We are not impressed with the argument that sound laws of economics require recognizing this defense. *A wide range of factors influence a company's pricing policies. Normally the impact of a single change in the relevant conditions cannot be measured after the fact; indeed a businessman may be unable to state whether, had one fact been different (a single supply less expensive, general economic conditions more buoyant, or the labor market tighter, for example), he would have chosen a different price. Equally difficult to determine, in the real economic world rather than an economist's hypothetical model, is what effect a change in a company's price will have on its total sales. Finally costs per unit for a different volume of total sales are hard to estimate. Even if it could be shown that the buyer raised his price in response to, and in the amount of, the overcharge and that his margin of profit and total sales had not thereafter declined, there would remain the nearly insuperable difficulty of demonstrating that the particular plaintiff could not or would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued.* Since establishing the applicability of the passing-on defense would require a convincing showing of each of these virtually unascertainable figures, the task would normally prove insurmountable." [footnotes omitted and emphasis added].

The Court added in a footnote:

"The mere fact that a price rise followed an unlawful cost increase does not show that the sufferer of the cost increase was undamaged. His customers may have been ripe for his price rise earlier; if a cost rise is merely the occasion for a price increase a businessman could have imposed absent the rise in his costs, the fact that he was earlier not enjoying the benefits of the higher price should not permit the supplier who charges an unlawful price to take those benefits from him without being liable for damages. This statement merely recognizes the usual principle that the possessor of a right can recover for its unlawful deprivation whether or not he was previously exercising it."

All of the difficulties referred to by the Supreme Court with respect to tracing the impact of an overcharge are present in the instant case, and most to a much greater extent than in *Hanover*. Assuming that the price paid by the wholesaler to the manufacturer contained an unlawful overcharge, claims of the present plaintiffs rest, as has been indicated, at the very least on the following additional premises: (a) that the overcharge was then passed on by the wholesaler to the plumbing contractor; (b) that the plumbing contractor then

passed the overcharge on to the builder; (c) that the builder passed on the overcharge to the purchasing homeowner; (d) in the case of used houses, each prior homeowner passed the overcharge on to the present plaintiffs.  Each of these steps represents activity in a completely new and unrestrained market.  The Court does not have before it a situation like that in the oil jobber cases, for even aside from any question of fixed markups, there is no assertion here that defendants through their alleged conspiracy, controlled any market beyond that in which they sold the fixtures to wholesalers. Instead there is no reason to assume that all of the additional factors referred to by the Supreme Court in *Hanover* as influencing a seller's pricing policies were not involved here.  This is particularly evident at the builder level.  For plaintiffs would have the Court believe that as the result of an overcharge of approximately ten to twenty dollars, a builder selling a twenty, twenty-five, or thirty thousand dollar house raised his price to reflect this overcharge (assuming such overcharge reached the builder).[13]  Such a view strikes the Court as incredible. Similarly plaintiffs' claim rests on the assumption, demonstration of which the Supreme Court in *Hanover, supra,* described as raising "insuperable difficulty", that the builder would not have raised his prices absent the overcharge or maintained the higher price had the overcharge been discontinued.  It would be incredible if the price of a house were determined not by the shifts in supply in demand in the market for homes as a whole but rather by a relatively miniscule change (with respect to the selling price of the house) in the price of the plumbing fixtures.  If the Supreme Court regarded the figures underlying corresponding assumptions as "virtually unascertainable" and applied such adjectives as "insuperable" and "insurmountable" to any attempt to support them in that case, it certainly follows *a fortiori* that insuperable difficulties inhere in the premises underlying the claims at issue in the instant case.  Accordingly, the Court agrees with defendants that the claims of the plaintiffs under consideration in their capacity as homeowners are blocked by insurmountable difficulties of proof.

It is true that the Supreme Court in *Hanover* carved out a narrow exception [14] to its rejection of the argument that the party initially paying an overcharge might pass on the excessive cost.  The Court stated that where the buyer alleged to have passed on the overcharge sold on the basis of a preexisting cost-plus contract or similar arrangement so that it would be easy to establish that he had not been damaged, the considerations requiring rejection of the argument that the overcharge was passed on because of the great difficulties of proof would be inapplicable.[15]  It is similarly true that some of these considerations would be inapplicable if a plaintiff in question bought plumbing fixtures as such as opposed to buying houses containing plumbing fixtures from the prior owners of

---

13. The figures of ten to twenty dollars are merely a rough approximation based on a cost of about $160 for two complete bathrooms, and alleged overcharges of 5 to 7 per cent testified to in depositions. The figures used are somewhat higher than those based on the above information to allow for the possibility of more fixtures and as a concession for purposes of argument.

14. State of Minnesota v. United States Steel Corporation, 299 F.Supp. 596, 609 (D.Minn.1969).

15. The Court alluded to another exception which might be applicable where there was no differential between the price unlawfully charged and some price that the seller was required by law to charge. This exception has no bearing on the instant case and will not be mentioned in further references to the exceptions in the text.

those houses. But it is just the (perhaps remote) possibility of proving such preexisting cost-plus contract or analogous arrangement or of showing a purchase of plumbing fixtures as such from which the instant plaintiffs are precluded due to their blatant failure to anwser interrogatories. Consequently further consideration of the application of this exception to the instant case would not be justified.

Plaintiffs' entire response in their brief with respect to this second argument [16] of defendants for dismissal consists of the following few sentences:

> "Judge Robertson [sic], in the *Hanover Shoe* case, stated the rule succinctly when he said ' \* \* \* where the plaintiff is a consumer of the product, rather than a middleman who re-sells it, he may recover the excess paid whether or not he has ultimately passed the excess along to his customers. Plaintiff [Hanover Shoe] was such a consumer!' 185 F.Supp. 826 (1960 (D.C.M.D.Pa.) (emphasis added)

> "The Supreme Court affirms this point but went [sic] on to say there may have been special circumstances where the owner of the shoe (not the consumer of the machinery) might have a claim.

> "The homeowner is Hanover Shoe, not the owners of a pair of shoes vis a vis International Shoe Machinery." [17]

While the precise thrust of plaintiffs' argument is not entirely clear, it appears to the Court that the implication drawn by plaintiffs is equally as inaccurate as the name of the judge and citation they give. Plaintiffs apparently concede that the Supreme Court limits recovery by remote purchasers to the special circumstances (preexisting cost-plus contract and analogous arrangements) [18] previously discussed. However, plaintiffs evidently consider the implication of the above statement of the District Court in *Hanover* to be that because a party [Hanover Shoe therein] is a consumer as opposed to a middleman that party is automatically entitled to recovery. Plaintiffs then assert that they are such consumers and claim that they are consequently in the same position as Hanover Shoe, Inc. rather than in the position of purchasers of shoes.

But the District Court's statement in *Hanover* carries no such implication. Judge Goodrich stated only that a party which was a "consumer" was in a better position than one which was a middleman *with respect to the argument that such party could not recover because that party had passed on the overcharge to its own customers.* No such argument against recovery by the instant plaintiffs is made by defendants in their motion presently before the Court. Instead defendants raise the question of *whether the alleged overcharge resulted in an injury to the present plaintiffs' business or property in the first instance as required by Section 4 of the Clayton Act.* That question was not involved in any way in the issue presented to Judge Goodrich. For in that case the plaintiff whose claims were under consideration was the *immediate purchaser* from the defendant. Consequently the implication drawn by plaintiffs from Judge Goodrich's middleman-consumer distinction is clearly erroneous.

It may be, however, that plaintiffs' argument can be more favorably construed

16. i. e. The argument that plaintiffs' claims should be dismissed on the basis of certain facts which may be presumed due to their failure to answer interrogatories under the applicable substantive law. (second argument set forth at outset of this Opinion, pp. 1–2)

17. Plaintiffs' "Answer of Motor of Defendant Wallace-Murray to Dismiss", pp. 4–5. The quote from the District Court opinion in *Hanover Shoe* appears at 185 F.Supp. 831. The word "herein" appears after the word "plaintiff" in the last line.

18. Second paragraph quoted above. There was some intimation to the contrary in the oral argument of plaintiffs, but no elaboration on this point was made. N.T. 58–59 (Hearing held January 27, 1970).

as a reflection of the position that they as homeowners are consumers and that therefore no party prior to them in the chain of distribution is a consumer. At least so construed plaintiffs' argument could be considered to support its position on the theory that if all prior purchasers were merely middlemen a pass-on argument could be successfully asserted against them with the result that the legitimate claims were those of plaintiff homeowners. Indeed plaintiff did assert in oral argument that the builder-owners in this case could not be consumers because they did not go around to each of the structures they sold and bathe in the tubs or make use of the other plumbing fixtures therein. (N.T. 59)[19]

■ However, the view that because one party in the chain of distribution is a consumer, prior parties cannot be, is untenable. Certainly plaintiffs herein would not so claim in those cases where they have bought their homes from prior residents (i. e. where they purchased used homes). And the Court does not believe that plaintiffs can justifiably so claim where they have purchased new houses either. For in *Hanover* itself, the fact that the ultimate purchasers of shoes may have been consumers did not prevent Hanover Shoe, Inc. itself from being a consumer rather than a middleman. While it may perhaps be argued that such a situation was possible in *Hanover* only because two different products, machinery and shoes, were involved there, it may similarly be argued that two different products, plumbing fixtures and homes, are involved here. Consequently this point adds nothing to such an argument. There is therefore no reason to assume that there cannot be more than one consumer in the chain of distribution.

■ Nor can this Court accept plaintiffs' argument that the builder-owners

cannot be "consumers" within the meaning of the District Court's opinion in *Hanover* because these builder owners did not bathe in the tubs or make use of the other plumbing fixtures in each of the houses they built and sold. The distinction between consumers and middlemen developed in *Hanover* and its application in the *Freedman* and *Atlantic City Electric* cases, *supra,* have been discussed at some length earlier. The builder-owners here involved fit in perfectly as consumers within the rationale of those decisions as explicated in the *Atlantic City Electric* case. They did not buy and resell plumbing fixtures. Instead they bought plumbing fixtures, incorporated these in the construction of houses, and sold those houses in an entirely new and independent market. For a builder-owner, the cost of the item which originated with defendants was, "only one of many variable factors in the determination of the price of the finished product [here, the house] to the consumer." Atlantic City Electric Co. v. General Electric Co., *supra,* 226 F.Supp. at 69 [footnotes omitted]. Moreover, recouping of any excess cost by a builder-owner in this case as with plaintiff in that case depends on how well he "performs in his own business, with the accounting and evidentiary problems this raises." *Id.* Accordingly, this Court believes that the builder-owners fall squarely within the meaning of the term "consumer" and rationale for use of the term. The Court does not believe that the term "consumer" as here applied to builder-owners for the purposes of the distinction in question includes either use of a washrag and soap or a specific intent to cleanse as a requisite element. Consequently the Court concludes that there was in the chain of distribution at least one "consumer" prior to each of the present plaintiffs with respect to passing-on any overcharge. The Court therefore rejects plaintiffs' argument based on the con-

19. Hearing held January 27, 1970.

sumer-middleman distinction that *Hanover Shoe* supports rather than undermines their claims.

Moreover, it should be noted that it is difficult to determine what vitality the consumer-middleman distinction, on which plaintiffs' argument rests, now has in light of the Supreme Court's opinion in *Hanover*. For the Supreme Court did not rely on this distinction in any way. Rather, it held that a buyer could recover, except in the special circumstances specified, despite any argument that he had passed on an overcharge, without making any reference to whether such a buyer was a consumer or a middleman. In any event, since, as indicated above, the implication drawn by plaintiff from this distinction for the purpose of the instant case, whether taken on its face or more favorably construed, is erroneous, this Court need not determine the present status of this distinction.

Finally, one further point deserves consideration. Plaintiffs in the instant cases apparently concede that the Supreme Court in *Hanover* limited both use of a pass-on argument against one purchaser and the possibility of recovery by the next more remote purchaser to special circumstances such as the existence of a preexisting cost-plus contract between them.[20] But the Court would be remiss if it overlooked entirely the fact that the Supreme Court did not have before it directly in *Hanover* a situation in which purchasers at more than one level in the chain of distribution were plaintiffs as this Court does here. It could therefore be argued that the Court in the instant case does not have before it one policy consideration involved there: that of insuring that there was at least one party which could recover against the defendant and thereby preventing the defendant from retaining the fruits of its illegality and thwarting the purpose of the antitrust laws. On this basis it could be contended that the Supreme Court's decision in *Hanover*, narrowly construed, does not require dismissal of the claims of the present plaintiffs.

However the Court cannot accept this argument for several reasons. First, the Court laid little stress on this consideration and discussed it very briefly. Hanover Shoe, Inc. v. United Shoe Manufacturing Corp., 392 U.S. 481, 494, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968). It is noteworthy in this connection that the Supreme Court in *Hanover* laid much less stress on this consideration than some of the courts in earlier cases. *Compare, for example,* Atlantic City Electric Co. v. General Electric Co., *supra* 226 F.Supp. at 71. In contrast, as has been seen previously, the Court laid extremely heavy stress on the doubtfulness of the economic connection between the overcharge and the level of the price charged by Hanover Shoe, Inc. to its customers as well as the difficulties of proof of such a connection. These considerations are present of course regardless of whether more remote purchasers are plaintiffs or not. The Court discussed these considerations in great depth and detail as can be seen from the portions quoted earlier. *Id.* at 487–493, 88 S.Ct. 2224. Second, these latter considerations are even more persuasive in the instant case than they were in *Hanover*. That is true because the cost of the use of the machinery in *Hanover* may well have been substantial in relation to the total cost of producing the shoes, whereas in the instant case the cost of the plumbing fixtures would comprise at most a very small portion of the total cost of building the houses in question. Third, the Court goes to great length to bring out the very sweeping nature of its rejection of the economic basis of a passing-on argument. *Id.* at 492–493, 88 S.Ct. 2224. This is quite evident in the footnote previously re-

20. See notes 4, 7, *supra.*

ferred to when the Court points out that it is almost impossible to tell whether the party alleged to have passed on an overcharge would have raised its price even *without the overcharge or maintained its price if the overcharge were discontinued. Id.* at 493 n. 9, 88 S.Ct. 2224. Similarly the Court points out that the cost rise may have been merely the occasion for the price increase. *Id.* And the Court will not even accept the argument that the defense should be recognized where it *can* be argued that the higher price could be charged only *because* of the cost increase. *Id.* at 491–492, 88 S.Ct. 2224. Moreover, the Court states its very holding in the case in the broadest of terms. After describing various situations in which it is clear that a buyer's action does not preclude its recovery, the Court states that it now holds that a buyer is equally entitled to recover if he raises his own price. *Id.* at 489, 88 S.Ct. 2224. The Court makes no attempt whatsoever to limit its statement of the rule to situations in which the party paying this increased price is not a litigant. Instead the Court sets forth an explicit rule that, except in the special circumstances described, proof that the buyer asserted to have passed on the loss did not recoup the excess cost by raising his own price is simply not an element of that buyer's case. *Id.* And unless the Court intended to state a rule permitting a double (treble-) recovery of the same loss, which this Court cannot believe, such a position must preclude recovery by more remote purchasers except in the same special circumstances. Finally, the Court views its position as reflecting fundamentally the same view as that un-

derlying the *Chattanooga Foundry* case, *supra,* and made explicit in the *Darnell-Taenzer* case, *supra.* Id. at 489–490, 88 S.Ct. 2224.[21] As has been indicated previously, that reasoning explicitly correlates rejection of the passing-on argument of defendants against one buyer with rejection of liability of those defendants to more remote purchasers, and indeed the Supreme Court quotes the language in *Darnell-Taenzer* to that effect. *Id.* at 490 n. 8, 88 S.Ct. 2224.

For all of these reasons, this Court believes that the Supreme Court's decision in the *Hanover Shoe* case, interpreted in light of the prior case law, requires the dismissal of the claims of the present plaintiffs.

It is also noteworthy that plaintiffs have not cited to the Court, nor has the Court discovered in its own research, a single case which has allowed the types of claims here asserted by plaintiffs. On the other hand, at least one court, in addressing itself directly to such claims, has refused to permit them. City of Philadelphia v. Westinghouse Electric Corp., 1961 Trade Cases ¶ 70,143 (E.D. Pa.1961), aff'd on other grounds,[22] sub nom., Philadelphia Electric Co. v. Westinghouse Electric Corp., 308 F.2d 856 (3rd Cir. 1962). This was a suit brought by the Philadelphia Electric Company for treble damages against suppliers of electrical equipment as the result of overcharges allegedly unlawful under the federal antitrust laws. A month after the suit was filed, the Pennsylvania Public Utilities Commission sought to intervene asserting that only it could effectively represent the interest of the consuming

---

21. The Supreme Court thereby put to rest the notion suggested in the Oil Jobber cases that those views were limited in application to Interstate Commerce Act cases. See discussion of those cases. *supra.*

22. The Court of Appeals viewed Judge Kirkpatrick's decision as concluding that

the interest asserted was not even the kind upon which a court may in its discretion grant permissive intervention. The Court of Appeals did not reach this issue because it felt that in any event Judge Kirkpatrick's denial of intervention was within the trial court's discretion. 308 F.2d 860–861.

public which ultimately may have borne the brunt of the overcharge. In denying the motion to intervene Judge Kirkpatrick of this Court ruled that, assuming the Commission were the agent of consumers or of the public generally, the interests it would represent would be too remote to allow it to qualify as a party injured in its business or property under Section 4 of the Clayton Act. The Court stated in relevant part:

"In other words, you must put a limit somewhere on the point where persons qualify as parties under that section of the Act. It is generally recognized, as I said in an earlier opinion in the *Harrison* case, that stockholders, creditors, or employees of corporations do not come within the Act although as such persons undeniably suffer injury in their property if the corporation is injured, and it would seem the Courts recognized that the Act does not give a right of action to everyone who can trace a financial loss, however remote, to a violation of the antitrust laws.

"I think within that principle that the consumer's interests, which are the only bases on which the application could be sustained, are entirely too remote to permit the intervention in this case and I will, therefore, strike the motion. I will deny the motion to intervene." *Id.*

*See also* Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co., 315 F.2d 564 (7th Cir. 1963), which also points out the remoteness of such claims.[23]

For all of the above-stated reasons, defendants' motion to dismiss must be granted.

And it is so ordered.

23. While the court's stress on the remoteness of impact and lack of proximate causation are significant in there bearing on the instant case, the Court's decision cannot be considered dispositive with respect to the issue before this Court. That is true because the court in *Allis-Chalmers*

relied in large part in its decision on its conclusion based on the *Keogh* case, *supra*, that administrative action rather than antitrust litigation was the proper approach to relief. That factor is not involved here.